1  Marianne Dugan (OR Bar # 932563)
   *Pro hace vice application forthcoming*
2  259 E. 5th Ave., Ste 200-D
3  Eugene, OR 97401
   (541) 338-7072
4  Fax: (866) 650-5213
   E-mail: mdugan@mdugan.com
5
6  James J. Tutchton (CA Bar # 150908)
   Tutchton Law Office, LLC
7  6439 E. Maplewood Ave.
   Centennial, CO 80111
8  Telephone: (720) 301-3843
   Email: jtutchtontlo@gmail.com
9
10 Attorneys for Plaintiff

11
12 **UNITED STATES DISTRICT COURT**
   **FOR THE EASTERN DISTRICT OF CALIFORNIA**
13 **SACRAMENTO DIVISION**

14
   CONSERVATION CONGRESS,                 )   Case No.
15                                         )
          Plaintiff,                       )
16                                         )
     v.                                    )        **COMPLAINT**
17                                         )
   UNITED STATES FOREST SERVICE, and       )
18 UNITED STATES FISH AND WILDLIFE         )
   SERVICE,                                )
19                                         )
          Defendants.                      )
20

21                      **INTRODUCTION**

22      1.      Defendants have approved a timber harvest project, known as the Algoma Project.

23 Through this Project, Defendants plan to cut timber in an area that is currently inhabited by

24 several pairs of Northern Spotted Owls, a species listed under the Endangered Species Act

25 ("ESA").

26      2.      Plaintiff alleges that in approving the Algoma Project, Defendants have violated

27 the ESA, the National Forest Management Act ("NFMA"), the National Environmental Policy

28 *Complaint*

Act ("NEPA"), the Administrative Procedure Act ("APA") and the regulations implementing these statutes.

3.    Plaintiff seeks relief declaring Defendants' approval of the Algoma Project is in violation of the ESA, NFMA, NEPA and the APA, and enjoining Defendants from proceeding with the Algoma Project until they comply with those laws.

**JURISDICTION**

4.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this lawsuit presents a federal question under the laws of the United States, including the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.*, the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600 *et seq.*; the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, the Declaratory Judgment Act ("DJA"), 28 U.S.C. §§ 2201 *et seq.*, and the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412.

5.    Plaintiff's request for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201(a) and 2202 (DJA), 16 U.S.C. § 1540(g)(1)(A) (ESA), and 5 U.S.C. § 706(2)(A) (APA).

6.    More than 60 days prior to commencing this action, Plaintiff provided Defendants and the Secretary of the Interior with written notice of the ESA claims asserted in this action as required by 16 U.S.C. § 1540(g)(2)(A)(i).

7.    Neither Defendant has taken action to remedy the violations of the ESA explained in Plaintiff's notice letter.  Accordingly, an actual controversy, within the meaning of the DJA, exists between Plaintiff and Defendants.  Plaintiff has exhausted all administrative remedies available to it as required by the APA.

**VENUE**

8.    Venue properly rests in the Eastern District of California pursuant to 16 U.S.C. § 1540(g)(3)(A) because the alleged violations of the ESA occur in this judicial district. Additionally, venue for Plaintiff's NFMA and NEPA claims properly rests in the Eastern District of California pursuant to 28 U.S.C. § 1391(e)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occur in this district and the federal public land involved in the Algoma Project is located in this district.

**INTRADISTRICT VENUE**

9.      This case should be assigned to the Sacramento Division of this Court because the Algoma Project is located in Siskiyou County.  See L.R. 120(d).

**PARTIES**

10.      Plaintiff, Conservation Congress, is a non-profit, Internal Revenue Code Section 501(c)(3), organization, incorporated in California.  Its membership includes individuals, organizations, and businesses.  The Conservation Congress is dedicated to maintaining, protecting and restoring the native ecosystems of northern California.  It has a longstanding organizational interest in the proper and lawful management of the National Forests, especially the Shasta-Trinity National Forest, located in northern California.  Additionally, Conservation Congress has an organizational interest in the protection of the Northern Spotted Owl.  The Conservation Congress' members, officers, and staff participate in a wide range of aesthetic, scientific, business, and recreational activities, such as hiking, fishing, hunting, photography, wildlife viewing, appreciation of scenery, and bird watching, including attempts to view and appreciate the Northern Spotted Owl, on the Shasta-Trinity National Forest including the specific federal lands involved in the Algoma Project and have concrete plans to continue these activities.  The organization's membership includes professional photography businesses and freelance photographers who earn income by photographing in northern California's National Forests, including the Shasta-Trinity National Forest.  Conservation Congress' members, officers, and staff pursue, and have concrete plans to continue pursuing, these aesthetic, scientific, business and recreational activities in the Shasta-Trinity National Forest near McCloud, California, including on the lands involved in the Algoma Project.  These interests of Conservation Congress, its members, officers, and staff are substantial and are adversely affected by Defendants' failure to comply with the ESA, NFMA, and NEPA.  The requested relief will redress the injuries of Conservation Congress and its members, officers, and staff.

11.      Defendant, United States Forest Service ("USFS") is a federal agency with the U.S. Department of Agriculture.  USFS is responsible for the management of the National Forests, including the Shasta-Trinity National Forest.  As part of its management responsibility USFS must insure that activities it conducts or authorizes on the Shasta-Trinity National Forest

comply with the ESA, NFMA, and NEPA.  USFS authorized the Algoma Project.

12.     Defendant, United States Fish and Wildlife Service ("FWS") is a federal agency within the U.S. Department of the Interior.  The Secretary of the Interior has delegated to FWS responsibility for administration and implementation of the ESA.  Under Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), FWS must engage in a process known as "consultation" with other federal agencies, such as USFS, to insure that any action authorized, funded or carried out by such agency is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of any designated critical habitat of such species.  In this case, USFS engaged in consultation with FWS concerning the Algoma Project.

GOVERNING LAW

**I.      The Endangered Species Act (ESA)**

**A.      Overview**

13.     "As it was finally passed, the Endangered Species Act of 1973 represented the most comprehensive legislation for the preservation of endangered species ever enacted by any nation."  Tennessee Valley Authority v. Hill, 437 U.S. 153, 180 (1978).

14.     The purpose of the ESA is to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered and threatened species …."  16 U.S.C. § 1531(b).

15.     Accurate, up-to-date, high quality information is essential to agency compliance with the ESA.  16 U.S.C. § 1536(c)(1).

16.     The ESA defines conservation as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary."  16 U.S.C. § 1532(3).

17.     Accordingly, the goal of the ESA is not only to temporary save endangered and threatened species from extinction, but also to recover these species to the point where they are no longer in danger of extinction, and thus no longer in need of ESA protection.

18.     Importantly, however, the protective provisions of the ESA do nothing to

conserve a species until that species is officially "listed" as either "threatened" or "endangered" under the terms of the Act.  16 U.S.C. § 1533.

**B.**   **Listing of Species Under the ESA**

19.   A species is listed as "endangered" if it is "in danger of extinction throughout all or a significant portion of its range."  16 U.S.C. § 1532(6).

20.   A species is listed as "threatened" if it is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  16 U.S.C. § 1532(20).

21.   Pursuant to its delegated authority from the Secretary of the Interior, FWS is required to list as either threatened or endangered any species facing extinction due to any one, or any combination of, the following five factors: (1) the present or threatened destruction, modification, or curtailment of the species' habitat or range; (2) overutilization for commercial, recreational, scientific, or educational purposes; (3) disease or predation; (4) the inadequacy of existing regulatory mechanisms; or (5) other natural or manmade factors affecting the species' continued existence.  16 U.S.C. §§ 1533(a)(1)(A)-(E).

22.   FWS' decision to list a species is limited solely to consideration of these five listing factors.  In considering the five listing factors, FWS must employ "the best available scientific and commercial information regarding a species' status, without reference to possible economic or other impacts of such determination."  50 C.F.R. § 424.11(b).

**C.**   **Recovery Plans**

23.   In order to encourage recovery of listed species, Section 4(f) of the ESA requires FWS "develop and implement [recovery] plans for the conservation and survival of [all listed] endangered species and threatened species … unless [it] finds that such a plan will not promote the conservation of the species," including "a description of such site-specific management actions as may be necessary to achieve the plan's goal."  16 U.S.C. § 1533(f).

**D.**   **Critical Habitat**

24.   As the objective of the ESA is to enable listed species not merely to survive, but to recover from their threatened or endangered status, Congress required the Secretary of the Interior to designate protected "critical habitat" for all listed species to achieve this end.  16

U.S.C. § 1533(a)(3); <u>Bennett v. Spear</u>, 520 U.S. 154, 157-58 (1997) ("[T]he objective of the ESA is to enable listed species not merely to survive, but to recover from their endangered status. To achieve this objective, Congress required the Secretary of the Interior to designate a 'critical habitat' for all listed species.").

25.     Critical habitat is defined as:

(i) the specific areas within the geographic area occupied by the species, at the time it is listed in accordance with the [ESA], on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and

(ii) specific areas outside the geographic area occupied by the species at the time it is listed in accordance with the [ESA], upon a determination by the Secretary that such areas are essential for the conservation of the species.

16 U.S.C. § 1532(5)(A).

26.     As in listing decisions, in decisions to designate critical habitat, FWS must make its decision "on the basis of the best scientific data available," but, unlike listing decisions, in designating critical habitat FWS must also consider "the economic impact, and any other relevant impact of specifying any particular area as critical habitat."  16 U.S.C. § 1533(b)(2).

27.     FWS "may exclude any area from critical habitat if [it] determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless [it] determines, based on the best scientific and commercial data available, that the failure to designate such area as critical habitat will result in the extinction of the species concerned."  <u>Id</u>.

**E.     Consultation with FWS**

28.     Section 7 of the ESA requires defendant USFS, in consultation with defendant FWS, to insure that any action authorized, funded, or carried out by USFS is not likely to (1) jeopardize the continued existence of any endangered species or threatened species (whether or not critical habitat has been designated), or (2) result in the destruction or adverse modification of designated critical habitat of such species.  16 U.S.C. §1536(a)(2).

29.     To comply with ESA Section 7(a)(2) an action agency, such as USFS in the present case, generally must prepare a document called a "biological assessment" ("BA").  16 U.S.C. § 1536(c)(1).

30.     The biological assessment process begins with a request from the action agency to FWS for information concerning whether any listed species or critical habitat is present in the project area.  Id.

31.     After FWS provides this information the action agency then makes the initial determination whether any listed species or critical habitat is likely to be affected by the proposed action.  16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12(a).

32.     If the proposed agency action may affect a listed species or critical habitat, the action agency must consult with FWS.  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a).

33.     If the agency action is likely to adversely affect a species or critical habitat, the action agency must engage in "formal consultation" with FWS.  50 C.F.R. § 402.14(a).

34.     This analysis requires review of potential cumulative impacts of projects on threatened and endangered species, precluding a finding of "will not adversely affect" when multiple projects may collectively "adversely affect" the species.

35.     If the action agency and FWS engage in formal consultation, FWS prepares a document known as a biological opinion ("BO") to evaluate whether the proposed action is likely to jeopardize the continued existence of a listed species or adversely modify its critical habitat.  50 C.F.R. § 402.14.

36.     The biological opinion must be based on the "best scientific and commercial data available."  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(d).

37.     The biological opinion must include a summary of the information on which it is based and must adequately detail and assess how the proposed action affects listed species and their critical habitats.  50 C.F.R. § 402.14(h).

38.     The biological opinion must also include an evaluation of the "cumulative effects on the listed species or critical habitat."  50 C.F.R. § 402.14(g)(3).

39.     During either informal or formal consultation FWS may suggest to the action agency modifications to the proposed project to avoid adverse affects to listed species or critical habitat.  50 C.F.R. § 402.13(b) (informal consultation); 50 C.F.R. § 402.14(g)(5) (formal consultation).

40.     In evaluating the potential for a proposed action to adversely modify critical

habitat, FWS must consider affects on either the survival or the recovery of the listed species.

41.     FWS's regulatory definition for "adverse modification" of critical habitat found in 50 C.F.R. § 402.02, which purports to limit the meaning of "adverse modification" to affects on critical habitat impacting both the survival and recovery of a listed is facially inconsistent with the ESA and has been stuck down by the Ninth Circuit.  Gifford Pinchot Task Force v. U.S. Fish and Wildlife Service, 378 F.3d 1059, 1069-70 (9th Cir. 2004), amended by 387 F.3d 968 (9th Cir. 2004).

42.     If FWS concludes that the proposed action "will jeopardize the continued existence" of a listed species, or result in the destruction or "adverse modification" of designated critical habitat, the biological opinion must outline "reasonable and prudent alternatives."  16 U.S.C. § 1536(b)(3)(A).

43.     If the action agency determines that its action is not likely to adversely affect a species or critical habitat it may engage in "informal consultation" with FWS.  50 C.F.R. § 402.13(a); 50 C.F.R.. § 402.14(b)(1).

44.     If, as a result of informal consultation, FWS issues a written "concurrence" to the action agency that its proposed action is not likely to adversely affect a listed species or critical habitat, the consultation process ends.  50 C.F.R. § 402.13(a); 50 C.F.R.. § 402.14(b)(1).

**F.     "Take" of Listed Species**

45.     The ESA prohibits "take" of species that are listed as endangered.  16 U.S.C. § 1538.

46.     FWS has extended the "take" prohibition to threatened species through regulation.  50 C.F.R. § 17.31(a).

47.     "Take" means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct.  16 U.S.C. § 1532(19).

48.     If a biological opinion concludes that the action is not likely to jeopardize the continued existence of a listed species, and will not result in the destruction or adverse modification of critical habitat, FWS must provide an "incidental take statement," specifying the amount or extent of such incidental taking on the listed species, and any "reasonable and prudent measures" that FWS considers necessary or appropriate to minimize such impact, and setting

forth the "terms and conditions" that must be complied with by the action agency, in this case USFS, to implement those measures.  16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(I).

49.     Without a biological opinion and an incidental take statement from FWS, USFS is not authorized to "take" any listed species, nor may it jeopardize the species or adversely modify critical habitat.

**G.     Reinitiation of Consultation**

50.     "If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered," either the action agency or FWS must "reinitiate" consultation.  50 C.F.R. § 402.16(b).

**II.     The National Environmental Policy Act (NEPA)**

51.     NEPA is our "basic national charter for protection of the environment."  40 C.F.R. § 1500.1(a).

52.     NEPA and its implementing regulations promulgated by the Council on Environmental Quality require federal agencies to prepare an environmental impact statement ("EIS') for "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C), 40 C.F.R. § 1508.11.

53.     NEPA has "twin aims."  First, it requires federal agencies "to consider every significant aspect of the environmental impact of a proposed action.  Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process."  Kern v. BLM, 284 F.3d 1062, 1066 (9th Cir. 2002), quoting Baltimore Gas & Electric Co. v. Natural Res. Def. Council, 462 U.S. 87, 97 (1983).

54.     The primary purpose of an EIS "is to serve as an action-forcing device to insure that the policies and goals defined in [NEPA] are infused into the ongoing programs and actions of the Federal Government."  40 C.F.R. § 1502.1.

55.     "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken … Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA."  40 C.F.R. § 1500.1(b).

56.     NEPA requires federal agencies to analyze the direct, indirect, and cumulative impacts of proposed actions.  40 C.F.R. §§ 1508.7 & 1508.8.

**III.     The National Forest Management Act (NFMA)**

57.     The National Forest Management Act (NFMA) requires the Forest Service to create a comprehensive Forest Plan for each national forest.  16 U.S.C. § 1604(a), (e); Inland Empire Pub. Lands Council v. United States Forest Serv., 88 F.3d 754, 757 (9th Cir. 1996) (describing how the Forest Service first develops a Forest Plan or Land Resource Management Plan consistent with the requirements of NFMA); Lands Council v. Powell, 395 F.3d 1019, 1032-33 (9th Cir. 2005).

58.     Once the Forest Plan is adopted, NFMA prohibits any site-specific activities that are inconsistent with the Forest Plan.  Inland Empire Pub. Lands Council, 88 F.3d at 757("[S]ite-specific projects must be consistent with the stage-one, forest-wide plan."); Lands Council, 395 F.3d at 1033.

59.     Pursuant to 16 U.S.C. § 1604(g)(3)(B), the Forest Service is required to "provide for diversity of plant and animal communities."

60.     To meet NFMA's requirement of providing for a diversity of animal communities the Forest Service must ensure that viable populations of native animals are maintained.  36 C.F.R. § 219.19(a)(6).

61.     The Forest Service's duty to maintain viable populations applies with special force to "sensitive" species.

62.     The Forest Service Manual (FSM 2670.22) includes the following provision for protection of sensitive species:

> 1.     Develop and implement management practices to ensure that species do not become threatened or endangered because of Forest Service actions.
>
> 2.     Maintain viable populations of all native and desired nonnative wildlife, fish, and plant species in habitats distributed throughout their geographic range on National Forest System lands.
>
> 3.     Develop and implement management objectives for populations and/or habitat of sensitive species.

## IV.     The Administrative Procedure Act

63.     The Court's review of Plaintiff's ESA, NEPA and NFMA claims is governed by the APA.

64.     The APA provides "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.

65.     The APA provides "the reviewing court shall … hold unlawful and set aside agency actions, findings, and conclusions found to be … arbitrary, capricious, or an abuse of discretion or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or which have been taken "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

## FACTUAL ALLEGATIONS

## I.     The Northern Spotted Owl

66.     Historically, the Northern Spotted Owl, *Strix occidentalis caurina*, ranged in structurally complex forests, commonly referred to as "old growth" forests, from southwest British Columbia through the Cascade Mountains and coastal ranges in Washington, Oregon and California, as far south as Marin County, California.

67.     Today, however, with the destruction of most old growth forests, the Owl's range and populations are dramatically reduced.

68.     Due to the widespread loss of Northern Spotted Owl habitat, the inadequacy of existing regulatory mechanisms to conserve the species, and its precipitous decline, FWS listed the Northern Spotted Owl as a threatened species under the ESA in 1990.  55 Fed. Reg. 26114 (June 26, 1990).

## II.     Late Successional Reserves

69.     The conservation strategy for the Northern Spotted Owl, established by USFS in the Northwest Forest Plan, includes the protection of large blocks of habitat to facilitate the survival of clusters of breeding owl pairs, the distribution of protected areas across a variety of ecological conditions, and the provision of suitable "connectivity habitat", within the surrounding "matrix" of less protected lands, to support the movement of owls across the landscape between reserves, thus increasing their chances for survival.

70.     The protected blocks of habitat established in the Northwest Forest Plan ("NWFP") are referred to as Late Successional Reserves ("LSRs") and are areas in which logging and other ground-disturbing activities are generally prohibited to protect the ecosystem and conserve the Northern Spotted Owl and other species.

**III.     Critical Habitat Designation for the Northern Spotted Owl**

71.     FWS initially designated critical habitat for the Northern Spotted Owl in 1992.  57 Fed. Reg. 1796.

72.     In 2008, FWS revised its critical habitat designation for the Northern Spotted Owl, reducing by approximately one-third the amount of land in northern California that it considered critical habitat for the Owl; but continuing the designation of the Algoma Project area as Northern Spotted Owl critical habitat.  73 Fed. Reg. 47326.

73.     In October 2010, the U.S. District Court for the District of Columbia entered an order requiring FWS to re-consider its 2008 rule revising the Owl's critical habitat and issue a new proposed critical habitat rule by November 15, 2011 and a new final critical habitat rule by November 15, 2012.  76 Fed. Reg. 38576, <u>citing</u> <u>Carpenters' Industrial Council v. Salazar</u>, Case No. 1:08-cv-1409-EGS (DDC).

**IV.     Recovery Planning for the Northern Spotted Owl**

74.     In 2008, FWS issued an ESA Recovery Plan for the Northern Spotted Owl.  73 Fed. Reg. 29471.

75.     This 2008 Recovery Plan was challenged in court, and FWS moved the U.S. District Court for the District of Columbia to vacate and remand the Recovery Plan to it for further review.

76.     In September 2010, FWS released a new draft revised Recovery Plan for the Northern Spotted Owl.  75 Fed. Reg. 56131.

77.     In July 2011, FWS issued a final revised Recovery Plan for the Northern Spotted Owl ("2011 Recovery Plan").  76 Fed. Reg. 38575.

78.     The 2011 Recovery Plan recognizes "past habitat loss and competition from Barred Owls, *Strix varia*, as the most pressing threats to spotted owl persistence."  76 Fed. Reg. 38575.

79.     To address these threats, the 2011 Recovery Plan recommends increased habitat protection for the Owl in both occupied and unoccupied areas.

80.     The 2011 Recovery Plan requires additional analysis of impacts to the Northern Spotted Owl resulting from projects which impact its prey species and cautions that "active management projects," such as Algoma, should explicitly evaluate the short-term impacts to the Northern Spotted Owl and its prey while considering alleged long-term ecological benefits of such projects.

81.     Recent studies of Northern Spotted Owl populations indicate the species' population is declining at approximately three percent per year.

**V.     The Algoma Project and Its Impacts on the Northern Spotted Owl**

82.     The Algoma Project is located about ten miles east of McCloud, California, on the McCloud District, Shasta-McCloud Management Unit of the Shasta-Trinity National Forest.

83.     Forest Supervisor, J. Sharon Heywood, approved the Algoma Project via a Record of Decision and Final Environmental Impact Statement in April 2012.

84.     The Project is entirely within the Algoma Late Successional Reserve and 99% of the Project is within designated Northern Spotted Owl critical habitat, Critical Habitat Unit ("CHU") 29, sub-unit CA-73.

85.     In July 2009, FWS transmitted a biological opinion to USFS after formal consultation with USFS on the Algoma Project.  This biological opinion was based, in part, on site visits to the project area.  It was also based on USFS biological assessment dated April 17, 2009.

86.     The biological opinion described the Algoma Project action area as containing 14,800 acres (14,760 federal and 40 private).  Within this area FWS found 1,188 acres of suitable nesting/roosting habitat, 10,116 acres of suitable foraging habitat, and 1,450 acres of capable habitat for the Northern Spotted Owl.  The remaining 2006 acres were deemed incapable of producing Northern Spotted Owl habitat.

87.     As of the 2009 biological opinion, FWS found three Northern Spotted Owl activity centers within the Project area, known as ST-203, ST-204, and ST-225.

88.     FWS recommends that an activity center site have a minimum of 50 percent

suitable habitat (defined as 500 acres of nesting/roosting habitat) within the core area (.5 mile radius area around the activity center) and 40 percent suitable habitat (defined as 1,136 acres of nesting/roosting, or foraging habitat) throughout the home range (1.3 mile radius area around the activity center).

89.     FWS has concluded that Northern Spotted Owl productivity and survivorship are reduced when the proportion of suitable (nesting/roosting) habitat within the .5 mile core area of an activity center falls below 500 acres or 50 percent.

90.     FWS has concluded that Northern Spotted Owl productivity and survivorship are reduced when the proportion of suitable habitat (nesting/roosting or foraging habitat) within the 1.3 mile radius, home range of an activity center falls below 1,336 acres or 40 percent.

91.     FWS has concluded that unless the home range of activity center contains a minimum of 1,085 acres of suitable (nesting/roosting or foraging) habitat "incidental take" of Owls will occur.

92.     ST-203 contains 496 acres of suitable habitat in its core area, rendering it slightly below the threshold 500 acres.  ST-203 contains 2,396 acres of suitable habitat in its home range, a figure above the 1,336 acre threshold.  The Algoma Project plans to log 48 acres of foraging habitat with the core area of ST-203, rendering it further below the 500 acre threshold.  The Project will also log 472 acres of foraging habitat in the home range of ST-203 leaving it only 588 acres above threshold.  According to USFS biological assessment, the Project will also log 7 acres of dispersal habitat in the core area and 217 acres of dispersal habitat in the home range.  This will bring the core down to only 441 acres.  The home range will have only 371 acres above the threshold.  ST-203 will be below the threshold for incidental take.  The biological opinion indicated that ST-203 was occupied by Northern Spotted Owls from 1989 to 1996.  In 1997 barred owls were detected in this historic Spotted Owl territory and have occupied it since.  However, in June 2009, a male barred owl and female spotted owl were found in ST-203 and the pair successfully hatched two cross-bred "sparred owls."  Barred owls were detected in ST-203 in 2010-11.

93.     ST-204 has only 225 acres of suitable habitat in its core area.  ST-204 has only 718 acres of suitable habitat in its home range.  The core area of ST-204 is below the 500 acre

threshold.  The home range of ST-204 is below the 1,336 acre threshold.  The 718 acres in the home range of ST-204 consists of nesting, roosting, and foraging habitat combine and is therefore below the threshold for incidental take.  The Algoma Project plans to log 25 acres in this home range, further reducing it to only 693 acres.  ST-204 has been consistently occupied by Spotted Owls since 1986, but were last confirmed present in 2008.

94.     ST- 225 has 501 acres in its core area and 2,332 acres in its home range.  Both the core and home range are above threshold.  Activity center ST-225 was first detected in 1997, when a pair of Spotted Owls established this new nest site.  USFS and FWS predicted this pair of Spotted Owls maybe that displaced from ST-203 by barred owls.  Since, 1997 a pair of Spotted Owls has occupied ST-225.  In 2008, this pair successfully nested and juvenile Spotted Owls were fledged.  Spotted Owls were last known to reproduce here in 2010.

95.     Since the 2009 biological opinion, FWS has found an additional Spotted Owl activity center in the Algoma Project area.  This new activity center is called ST-226.  ST-226 has 430 acres in its core area and 1,190 acres in its home range.  Accordingly, both the core and home range of ST-226 are below the threshold values.  The Algoma Project will log 1,013 acres of dispersal habitat in the home range of ST-226 bringing it down to only 177 acres.  The 1,190 acres currently in the home range of ST-226 is comprised of nesting, roosting, and foraging habitat combined thereby making it below the threshold for incidental take even prior to the additional logging.  The occupancy status of ST-226 is uncertain, but a resident single female NSO was observed there in 2011.

96.     In its 2009 biological opinion, FWS found that implementation of the Algoma Project will degrade 2,900 acres of suitable Northern Spotted Owl foraging habitat by thinning from below, degrade 300 acres of suitable foraging habitat through single tree selection thinning, and remove 1,050 acres of suitable foraging habitat through sanitation treatments.

97.     In the 2009 biological opinion, FWS concluded that treated stands will likely be less favorable to Northern Spotted Owls in the short-term (defined by FWS as 20 to 30 years) and that the Project had the potential to negatively affect the primary constituent elements of foraging habitat by reducing the number of snags, downed woody material shrubs, forbs, grasses, and fungi which provide key components of foraging and denning for Northern Spotted Owl

prey species.

98.     The 2009 biological opinion concluded that, in total, the Algoma Project would degrade 4,250 acres of foraging habitat which was designated as critical habitat for the Northern Spotted Owl (2,900 + 300 + 1,050 = 4,250).

99.     In the 2009 biological opinion, FWS indicated that Northern Spotted Owls within the Project area may experience an increase in predation risk by great horned owls due to the creation of more open stands and that foraging opportunities may be reduced due to reduced canopy closure, reduced tree height diversity, and a reduction in snags, course woody debris, and understory vegetation.

100.     Based on its analysis, in the 2009 biological opinion FWS authorized incidental take in the form of harm or harassment of no more than three pairs of Northern Spotted Owls associated with the degradation of 4,250 acres of foraging habitat.

101.     Subsequently, after additional surveys detected a previously unknown Northern Spotted Owl on the southern portion of the Project area USFS and FWS re-initiated consultation.

102.     The new surveys in 2011 resulted in the establishment of a new Northern Spotted Owl activity center, called ST-226 in the Project Area.

103.     The reinitiated consultation was completed in April 2012.

104.     In the Letter of Concurrence that resulted from the new consultation, completed in April 2012, FWS indicated that the reinitiation of consultation was necessary because the potential for incidental take of Owls in the new activity center, ST-226, had not been previously analyzed.

105.     FWS also indicated that during the re-initiation process USFS decided to modify its proposed action so that the Project would not be likely to adversely affect the Northern Spotted Owl or its designated critical habitat.

106.     FWS also indicated in its 2012 Letter of Concurrence that a more rigorous examination of habitat suitability within the Project Area resulted in the reclassification of some foraging habitat as dispersal habitat.

107.     However, contrary to FWS' assertions, USFS made no apparent modifications to its proposed Project between the initial and re-initiated consultation processes.

108.    The agencies did, however, reclassify a large amount of foraging habitat as dispersal habitat.  This is the only change in the Project between the 2009 and 2012 consultations.

109.    Accordingly, based on this reclassification the agencies concluded that Owl habitat in the Project area was in fact in worse condition by the time of the second consultation (i.e. there was less foraging habitat and more dispersal habitat, a lower habitat quality).

110.    Incongruously, despite this finding that the habitat was of lower quality than previously believed by FWS and USFS, and despite finding that the Project Area contained an additional Owl territory, the agencies nonetheless concluded in the second consultation that the same Project would now have fewer impacts on the resident Spotted Owls.

111.    In its second consultation, FWS described the Algoma Project as involving 2,487 acres of thinning, 930 acres of thinning with sanitation, and 176 acres of thinning by single tree selection.

112.    An additional, 1,070 acres would be plantation thinned.

113.    4,526 acres of these treatments overlap with NSO CHU 29, subunit 73.

114.    An estimated 170 logging landings would be required and 1,300 acres would continue to be treated for fuel management after the initial treatments.

115.    FWS' description of the Project in the second consultation is inconsistent with the description offered by USFS in its Final Environmental Impact Statement (FEIS).

116.    For example, while FWS indicated only 170 logging landings would be required, the FEIS stated 215 would be required.

117.    FWS indicated that all snags would be removed in the Defensible Fire Management Zone totaling 240 acres, while the FEIS stated all snags would be removed on 320 acres.

118.    FWS indicated the Project would log 1,740 acres of foraging habitat and the FEIS stated 1,815 acres of foraging habitat would be logged.

119.    During the reinitiated consultation, FWS reevaluated the amount of foraging habitat found in the Project area stating: "[b]ased on field review conducted on 12/06/11 and additional discussions with Forest staff, we concluded that the original BA did not accurately

*Complaint*                                              17

reflect the amount and quality of foraging habitat with units and the project area as a whole."
FWS did not explain how this field review, conducted in the winter of 2011, varied from earlier
field reviews, conducted for the 2009 biological opinion, or which specific areas were reviewed
or how they were accessed during the winter.

120.    FWS found the original BA overestimated the amount of foraging habitat within
the Project area.

121.    Originally, FWS had determined that the Project area contained 10,116 acres of
foraging habitat for the NSO and 1,450 acres of capable habitat.

122.    Upon re-evaluation FWS revised these numbers downward to 8,204 acres of
foraging habitat within the Project area and 5,235 acres of dispersal habitat.

123.    Nonetheless, despite this finding that Spotted Owl habitat in the Project area was
of lower quality than previously believed, FWS reversed course and found the logging of this
same habitat would now have less impact on the same resident owls and the newly discovered
owl territory.

124.    As in the 2009 biological opinion, in its 212 Letter of Concurrence FWS stated
that 99% of the Algoma Project would take place in the Owl's designated critical habitat.

125.    With the exception of 140 acres, the entire Project is within 2008 Critical Habitat
Unit (CHU) 29, subunit 73.

126.    Subunit 73 is approximately 14,564 acres in size of which 4,526 acres (31%) are
proposed for treatment through the Algoma Project.

127.    FWS did not acknowledge that the Mudflow Project, also recently approved by
USFS and FWS, occurs in the same CHU and poses cumulative impacts to this CHU.

128.    Additionally, for purposes of analysis USFS and FWS split the Algoma Late
Successional Reserve (LSR RC-357) into a northern and southern unit and thereby avoiding
looking at the impacts of a third timber sale, the Moosehead sale, that is proposed for the
southern half of the Algoma LSR.

129.    In its Letter of Concurrence, FWS stated that of the 4,526 acres of designated
critical habitat proposed for treatment in the Algoma Project, 1,740 acres are foraging habitat and
2,785 are dispersal habitat.  This change from the 2009 biological opinion is due solely to FWS

reclassification of habitat types downward from foraging to dispersal.  This change is not the result of changes to the Project itself.

130.    FWS concurred with USFS determination that effects to critical habitat will be insignificant or discountable and are not likely to adversely affect designated critical habitat.

131.    In its Letter of Concurrence, FWS never explained or discussed any changes made to the proposed project by USFS since the original biological opinion was issued.

132.    In its Letter of Concurrence, FWS did not explain why its prior conclusion in the biological opinion that indicated that Northern Spotted Owls within the Project area may experience an increase in predation risk by great horned owls due to the creation of more open stands and that foraging opportunities may be reduced due to reduced canopy closure, reduced tree height diversity, and a reduction in snags, course woody debris, and understory vegetation is no longer valid.  Indeed, the new consultation does not even mention predation by Great Horned Owls.

133.    The original biological opinion authorized incidental take in the form of harm or harassment of no more than three pairs of Northern Spotted Owls associated with the degradation of 4,250 acres of foraging habitat.

134.    FWS did not adequately explain how essentially the same project in the same area no longer posses the same risk of incidental take.

135.    FWS did find that some of the habitat it previously thought, in the 2009 biological opinion, was foraging habitat was not in fact foraging habitat; but did not address the fact that Owls are using this habitat and this habitat is still being logged.  However, the information on which FWS based its decision to reclassify the foraging habitat to dispersal habitat was available to FWS when the original biological opinion was written and at that time FWS did not reclassify the habitat.  FWS did not cite any new or previously unavailable information which explains its change in position.

**COUNT I**
**(Both Defendants)**
**Violation of the ESA and APA**
**Failure to Conduct Formal Consultation**

136.    Plaintiff re-alleges and incorporates the allegations in all preceding paragraphs of the Complaint herein by reference.

137.    USFS and FWS violated the ESA by failing to initiate formal consultation over the individual and cumulative adverse effects of the Algoma Project on the Northern Spotted Owl.  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a).

138.    USFS's failure to initiate formal consultation violates the ESA within the meaning of the APA.  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a); 5 U.S.C. §§ 701-706.  FWS' failure to initiate formal consultation is contrary to the ESA and therefore in violation of the APA.  Id.

139.    Plaintiff is entitled to recover costs, disbursements and attorney's fees under the ESA, 16 U.S.C. § 1540(g), and/or the Equal Access to Justice Act, 28 U.S.C. § 2412.

**COUNT II**
**(Both Defendants)**
**Violation of the ESA and APA**
**Failure to Insure Against Jeopardy and the Destruction or**
**Adverse Modification of Critical Habitat**

140.    Plaintiff re-alleges and incorporates the allegations in all preceding paragraphs of the Complaint herein by reference.

141.    Each Defendant is required to conduct an independent analysis and make an independent finding under ESA Section 7(a)(2) with regard to the Project's effects on designated critical habitat.  16 U.S.C. § 1536(a)(2).

142.    Defendant USFS violated the ESA within the meaning of the APA and Defendant FWS acted contrary to the ESA in violation of the APA by concluding that the Project would not adversely affect critical habitat for the Northern Spotted Owl.  16 U.S.C. § 1536(a)(2); 5 U.S.C. §§ 701-706.

143.    Both Defendants have failed to properly analyze the independent importance of designated critical habitat for species survival and recovery purposes.

144.    In addition, both Defendants have improperly downplayed the potential impacts of the Project on the Northern Spotted Owl's critical habitat by considering only broad-scale, long-term impacts.

145.    Both Defendants have failed to properly make this independent inquiry in violation of ESA Section 7(a)(2).  16 U.S.C. § 1536(a)(2).

146.    The inadequacy of Defendants' consultation under the ESA is arbitrary, capricious, an abuse of discretion, and not in accordance with law.  5 U.S.C. §§ 701-706.

147.    Plaintiff is entitled to recover costs, disbursements and attorney's fees pursuant to the ESA, 16 U.S.C. § 1540(g), and/or the Equal Access to Justice Act, 28 U.S.C. § 2412.

**COUNT III**
**(Both Defendants)**
**Violation of the ESA**
**Failure to Reinitiate Consultation**

148.    Plaintiff re-alleges and incorporates the allegations in all preceding paragraphs of the Complaint herein by reference.

149.    The ESA required both USFS and FWS to reinitiate consultation "[i]f new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered."  50 C.F.R. § 402.16(b).

150.    Since the completion of consultation and the issuance of USFS's Biological Assessment and FWS' Letter of Concurrence, new sources of information have revealed likely effects of the Algoma Project not previously considered.  In addition, the Agencies failed to fully address the requirements of the 2011 Recovery Plan for the Northern Spotted Owl.

151.    The 2011 Recovery Plan requires additional analysis of impacts from changes to potential prey species, which USFS acknowledges are anticipated if the Algoma Project is carried out.

152.    Both the 2010 draft and 2011 final Recovery Plans for the Northern Spotted Owl were available to both USFS and FWS during their analysis of the Algoma Project, but the

agencies relied primarily on the 2008 Recovery Plan, while cherry-picking two segments of the 2011 Recovery plan, but ignoring its direction to analyze impacts on prey species.

153.    By failing to reinitiate consultation, USFS and FWS have failed to insure the effects of the Algoma Project will not jeopardize the continued existence of the Northern Spotted Owl or adversely modify its designated critical habitat in violation of the ESA, 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.16(b), and have taken agency action that is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the ESA or the procedures required by law in violation of the APA, 5 U.S.C. § 706(2)(A) & (D).

154.    Plaintiff is entitled to recover costs, disbursements and attorney's fees under the ESA, 16 U.S.C. § 1540(g) and/or the Equal Access to Justice Act, 28 U.S.C. § 2412.

**COUNT IV**
**(Both Defendants)**
**Violation of ESA**
**Failure to Use Best Available Science**

155.    Plaintiff hereby re-alleges and incorporates the allegations in all preceding paragraphs of this Complaint herein by reference.

156.    The Defendants have also violated ESA Section 7(a)(2) by failing to use the best available science, 16 U.S.C. § 1536(a)(2).

157.    The inadequacy of the Defendants' consultation under the ESA is arbitrary, capricious, an abuse of discretion, and not in accordance with law.  5 U.S.C. §§ 701-706.

158.    Plaintiff is entitled to recover costs, disbursements and attorney's fees pursuant to the ESA, 16 U.S.C. § 1540(g), and/or the Equal Access to Justice Act, 28 U.S.C. § 2412.

**COUNT V**
**(USFS)**
**Violation of the ESA**
**Irreversible or Irretrievable Commitment of Resources**

159.    Plaintiff hereby re-alleges and incorporates the allegations in all preceding paragraphs of this Complaint herein by reference.

160.    Section 7(d) of the ESA prohibits Defendant USFS from making "any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect

of foreclosing the formulation or implementation of any reasonable and prudent alternative measures" during the consultation process.  16 U.S.C. § 1536(d).

161.    By approving the Project without properly completing formal consultation Defendant USFS is violating Section 7(d) of the ESA.

162.    This ESA violation is arbitrary, capricious, an abuse of discretion, and not in accordance with law.  5 U.S.C. §§ 701-706.

163.    Plaintiff is entitled to recover costs, disbursements and attorney's fees pursuant to the ESA, 16 U.S.C. § 1540(g), and/or the Equal Access to Justice Act, 28 U.S.C. § 2412.

**COUNT VI**
**(USFS)**
**Violation of ESA**
**Prohibited Taking of Listed Species**

164.    Plaintiff hereby re-alleges and incorporates the allegations in all preceding paragraphs of this Complaint herein by reference.

165.    The Algoma Project will log occupied habitat of the Northern Spotted Owl, which constitutes "harm" and "harassment" within the ESA's take definition, and therefore constitutes "take" of the Northern Spotted Owl.

166.    Because Defendant USFS has not completed formal consultation and obtained a biological opinion and incidental take statement for the implementation of the Project and ongoing adverse effects to the Owl, no take of the Northern Spotted Owl is properly authorized.

167.    Therefore, Defendant USFS is in violation of Section 9 of the ESA, 16 U.S.C. § 1538.

168.    Plaintiff is entitled to recover costs, disbursements and attorney's fees pursuant to the ESA, 16 U.S.C. § 1540(g), and/or the Equal Access to Justice Act, 28 U.S.C. § 2412.

**COUNT VII**
**(USFS)**
**Violation of NFMA**
**(Snags/Down Logs and Sensitive Species)**

169.    Plaintiff hereby re-alleges and incorporates the allegations in all preceding paragraphs of this Complaint herein by reference.

*Complaint*                                    23

170.     NFMA mandates that Defendant USFS's activities carried out on the National Forests "shall be consistent with land management plans."  16 U.S.C. § 1604(I); 36 C.F.R. § 219.10(e).

171.     The Shasta-Trinity National Forest ("STNF") Land and Resource Management Plan (LRMP"), including its incorporation of the Northwest Forest Plan Record of Decision is a "land management plan."

172.     As part of achieving the species viability goal, the LRMP requires snags and down logs in Late-Successional Reserves ("LSRs") be maintained at naturally occurring levels or two to six snags per acre and four to six down logs per acre.

173.     The Algoma Project will <u>remove</u> 320 acres of snag and down log assemblage, and will not maintain snags and down logs in LSRs at naturally occurring levels or two to six snags per acre and four to six down logs per acre.

174.     USFS states that the LRMP's snag and down log requirement will be met at the scale of 100-acre landscape, which is not allowed under the provisions of the LRMP.

175.     The Northern Goshawk is listed by USFS as a sensitive species in the Project Area.

176.     29% of the Northern Goshawk's suitable nesting/roosting/foraging habitat has been degraded or removed in the Project Area over the past twenty years.

177.     The Algoma Project will degrade at least another 5% of Northern Goshawk suitable habitat and will reduce canopy cover from 70% to 45%, a loss that will take a minimum of 20 to 30 years to recover.

178.     USFS also lists American Marten and Pacific Fisher (furbearing species) as sensitive species.

179.     No furbearer surveys have been conducted in the Project Area.

180.     15% of suitable (resting/denning) habitat for furbearers has been degraded or removed in the Project Area over the past twenty years.

181.     The Algoma Project will remove twenty acres of furbearer foraging habitat due to road-related actions.

182.     USFS made a determination for all three sensitive species that the Algoma Project "may affect individuals but would not cause a trend towards federal [ESA] listing, or increase the current priority listing, or a loss of viability."

183.     These determinations are not supported because USFS has little information on the population of these species and therefore cannot ensure that viable populations will be protected on the Forest.

184.     USFS failed to comply with NFMA in planning the Algoma Project.

185.     Defendant's actions as described above are arbitrary, capricious, not in accordance with law, and without observance of procedures required by law, within the meaning of the APA, 5 U.S.C. § 706.

186.     Plaintiffs are entitled to their reasonable fees, costs, and expenses associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

**COUNT VIII**
**(USFS)**
**Violation of NEPA**
**(Failure to Analyze Direct, Indirect, and Cumulative Impacts and Provide Adequate Public Comment)**

187.     Plaintiff hereby re-alleges and incorporates the allegations in all preceding paragraphs of this Complaint herein by reference.

188.     NEPA requires federal agencies to analyze the foreseeable environmental impacts, including direct, indirect, and cumulative impacts of major federal actions.  42 U.S.C. § 4332(c)(I); 40 C.F.R. § 1508.7.

189.     NEPA requires the analysis and consideration of cumulative effects which result from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions.  40 C.F.R. § 1508.25(a).

190.     A federal timber sale is a major federal action as defined by NEPA.

191.     The Record of Decision for the Algoma Project violates NEPA because it fails to adequately analyze and disclose the direct, indirect, and cumulative effects of the Project in several respects.

**Wildfire**

192.     A major premise of the Algoma Project is that it will protect the Late-Successional Reserve (LSR) from a catastrophic fire, but USFS failed to analyze and disclose scientific research on the benefits of fire to wildlife habitat; direction in the LSR Assessment and LRMP regarding the benefits of fire in LSR habitat and how to design silvicultural activities to reduce fire risk; and scientific research on forest fires in general.

193.     For example, the Algoma Project will log trees across all age and diameter classes in several of the prescriptions, although the LRMP standards and guidelines for LSRs state in part: "silvicultural activities aimed at reducing risk shall focus on <u>younger stands</u> in LSRs … [T]he scale of salvage and other treatments should not generally result in degeneration of currently suitable owl habitat or other late-successional conditions."

**Insects and Disease**

194.     The specialist report about insects includes the following statement on insect and disease populations found in the STNF LRMP LSR Assessment:  "It is desirable to continue to have insect and disease populations withing the LSR/MLSA's and they are generally maintained at endemic levels."

195.     USFS asserted that there is a beetle outbreak and root disease but provided no data about the extent or location of these problems in the Project Area.

196.     USFS did not analyze and disclose scientific studies regarding the ecological role and dynamics of beetle infestations.

197.     The silviculturist specialist report argues for thinning and sanitation in the Project Area based on conjecture about future droughts according to both historical trends and trends in global climate change, but acknowledges that models used to anticipate changes cannot account for all compounding factors, and does not analyze and disclose conflicting scientific studies.

198.     The proposal to thin and sanitize areas that evidence root disease also directly contradicts recommendation for preventative and corrective management of these fungal diseases.

**Cumulative Effects on Northern Spotted Owl**

199.    The Final Environmental Impact Statement ("FEIS") states there are 8,204 acres of Northern Spotted Owl foraging habitat in the Critical Habitat Unit ("CHU") in which the Project Area is found.

200.    The Algoma Project will degrade 1,815 acres (22%) of the 8,204 acres of Northern Spotted Owl foraging habitat in this CHU.

201.    When combined with the Moosehead Project (which the FEIS did not analyze) an additional 1,400 acres of foraging habitat will be logged – 39% of the foraging habitat in the CHU.

202.    9,500 acres of land within the Project Area has been logged in the past twenty years.

203.    7,424 additional acres of foraging habitat has been degraded due to 32 projects in the action area in the past twenty years.

204.    Future projects are expected to degrade an additional 4,923 acres of Northern Spotted Owl foraging/dispersal habitat.

205.    39% of the larger action area of 43,390 acres has been degraded or will be degraded in terms of available Northern Spotted Owl foraging habitat.

206.    In addition, private actions (where quantifiable) have removed Northern Spotted Owl nesting habitat on 80 acres and foraging habitat on 607 acres.

207.    It appears, based on the above figures, that 100% of the foraging habitat in the CHU has been degraded at some point in time including over the past twenty years or will soon be degraded.

208.    The FEIS simply lists the projects and amount of foraging habitat degraded but fails to include any quantitative analysis of how remaining foraging habitat is functioning – or not functioning.

209.    Grazing will cause additional impacts to Northern Spotted Owl habitat.

210.    About 18,000 acres of private timber harvest plants ("THPs") have been completed within the Project Area (acreages may overlap, but USFS has not provided the data to clarify that issue).

211.    5,153 acres of private THPs are ongoing and two THPs are in the planning stage.

212.    The majority of these private projects will not provide suitable habitat for the Northern Spotted Owl or its prey species for several decades.

213.    None of these impacts to the Owl or its habitat are analyzed in USFS cumulative effects analysis.

214.    Within the last 5 years alone, USFS has informally consulted with FWS in the Shasta-McCloud Management Unit on the following timber sales: Powder, Elk Thin, Hemlock, Davis, McCloud Flats, Edson, Pilgrim, Sugar Roadside Hazard Tree Removal, Mudflow and now Algoma.

215.    In each case, FWS issued a letter of concurrence stating the project may affect, but was not likely to adversely affect the Northern Spotted Owl or its designated critical habitat despite these projects overlapping and/or being next to or adjacent to each other.  Many of these prior timbersales are in the same CHU as the Algoma Project.

216.    Additional upcoming projects requiring FWS consultation in the McCloud Flats include the Moosehead, Porcupine, Harris and Elk LSR.

217.    The "Environmental Baseline" for the Owl which USFS used in the Algoma Project relies on 2003 data as a proxy for the impacts of actions completed prior to 2003 for cumulative effects; but USFS never monitored all activities affecting the environmental baseline (timbersales, roads, mining, etc.) and never stated whether there was any "take" of Owls from prior activities.

**Sensitive Species**

218.    As discussed *supra*, the Project will have impacts on sensitive species designated by USFS.

**Public Notice and Comment**

219.    FWS April 2012 Letter of Concurrence was not available when the FEIS went through public notice and comment.

220.    The public never had an opportunity to review or comment upon the April 2012 Letter of Concurrence.

221.    The public never had an opportunity to review or comment upon FWS/USFS reclassification of critical habitat in the Project Area from foraging to dispersal habitat because this reclassification took place outside of the NEPA process and was not discussed or disclosed through the NEPA process.

222.    USFS's actions as described above are arbitrary, capricious, not in accordance with law, and without observance of the procedures required by law, within the meaning of the APA, 5 U.S.C. § 706.

223.    Plaintiff is entitled to recover its reasonable fees, costs, and expenses associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

### PRARY FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A.    Declare that USFS violated the National Environmental Policy Act, the National Forest Management Act, and the Administrative Procedure Act, and their implementing regulations, in approving the Algoma Project.

B.    Declare that USFS violated the Endangered Species Act and the Administrative Procedure Act, and their implementing regulations (1) in approving the Algoma Project, and (2) in the consultation process for the Northern Spotted Owl.

C.    Declare that FWS violated the Endangered Species Act and the Administrative Procedure Act, and their implementing regulations (1) in approving the Algoma Project, and (2) in the consultation process for the Northern Spotted Owl.

D.    Declare that the Record of Decision for the Algoma Project is insufficient as a matter of law.

E.    Declare that the ESA consultation process for the Northern Spotted Owl for the Algoma Project is insufficient as a matter of law.

F.    Enjoin USFS from undertaking any activities related to the Algoma Project unless and until USFS has complied with NEPA, NFMA, and the APA.

G.    Enjoin USFS from undertaking any activities related to the Algoma Project unless and until Defendants have complied with the ESA.

H.     Award Plaintiff its reasonable attorney's fees and costs incurred in this action pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and/or the ESA, 16 U.S.C. § 1540(g).

I.     Grant Plaintiff such additional relief as the Court deems just and equitable.

Respectfully submitted November 15, 2012.

*s/ James J. Tutchton*
James J. Tutchton (CA Bar No. 150908)
Attorney for Plaintiff

*Complaint*                                                     30