UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONSERVATION CONGRESS, | No.  2:12-cv-02800-TLN-CKD |
| Plaintiff, | |
| v. | **MEMORANDUM AND ORDER** |
| UNITED STATES FOREST SERVICE, and UNITED STATES FISH AND WILDLIFE SERVICE | |
| Defendants, | |
| and | |
| FRANKLIN LOGGING, INC., and SCOTT TIMBER, CO., | |
| Defendant Intervenors | |

The matter is before the Court on Cross-Motions for Summary Judgment by Plaintiff Conservation Congress ("Plaintiff") (ECF No. 52), Defendants U.S. Forest Service and U.S. Fish and Wildlife Service ("Defendants") (ECF No. 68), and Defendant Intervenors Franklin Logging, Inc. and Scott Timber Co. ("Defendant Intervenors") (ECF No. 62).  At issue is Defendants' planning, consultation, and implementation of the Algoma Vegetation Management Project occurring within the Shasta-Trinity National Forest.  The primary concern is the Project's effect on the Northern Spotted Owl, a species occupying the Algoma Project area and listed as

"threatened" under the Endangered Species Act.  Plaintiff's First Supplemental Complaint (ECF No. 33), upon which the parties move for summary judgment, contains six causes of action which assert violations under the Endangered Species Act, the National Forest Management Act, and the National Environmental Policy Act.  For the reasons discussed below, the Court grants summary judgment in favor of Defendants and Defendant Intervenors, and denies Plaintiff's Motion for Summary Judgment.

## I.    **Background**

### A.    **Statutory Background**

#### i.    Endangered Species Act

The purpose of the Endangered Species Act ("ESA") is to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered and threatened species …." 16 U.S.C. §1531(b).  Pursuant to its delegated authority from the Secretary of the Interior, the U.S. Fish and Wildlife Service ("FWS") is required to list as either threatened or endangered any species facing extinction due to any one, or any combination of, the following five factors: (1) the present or threatened destruction, modification, or curtailment of the species' habitat or range; (2) overutilization for commercial, recreational, scientific, or educational purposes; (3) disease or predation; (4) the inadequacy of existing regulatory mechanisms; or (5) other natural or manmade factors effecting the species' continued existence.  16 U.S.C. § 1533(a)(1)(A)-(E).

In order to encourage recovery of listed species, section 4(f) of the ESA requires the FWS to "develop and implement [recovery] plans for the conservation and survival of [all listed] endangered species and threatened species … unless [it] finds that such a plan will not promote the conservation of the species."  16 U.S.C. § 1533(f).  Also to encourage recovery, the ESA requires the Secretary of the Interior to designate "critical habitat" for all listed species.[1]  16

---

[1] The ESA defines "critical habitat" as:

> (i)    the specific areas within the geographic area occupied by the species, at the time it is listed in accordance with the [ESA], on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management

2

1   U.S.C. § 1533(a)(3).

2       Section 7(a)(2) of the ESA requires that each federal agency must "insure that any action

3   authorized, funded, or carried out by such agency … is not likely to jeopardize the continued

4   existence of any endangered species or threatened species or result in the destruction or adverse

5   modification" of the designated critical habitat of the listed species.  16 U.S.C. § 1536(a)(2).

6   Accordingly, Section 7(a)(2) and its implementing regulations set out a consultation process for

7   determining the impacts of the proposed agency action.  *See* 50 C.F.R. § 402.02.  First, the

8   agency contemplating the action (in this case the U.S. Forest Service, hereinafter "Forest

9   Service") must request information from the appropriate federal wildlife service (in this case the

10  FWS) regarding "whether any species which is listed or proposed to be listed may be present in

11  the area of such proposed action." 16 U.S.C. § 1536(c)(1).  If the FWS determines that listed

12  species may be present in the affected area, the agency preparing to act must produce a

13  "biological assessment" in accordance with the National Environmental Policy Act "for the

14  purpose of identifying any endangered species or threatened species which is likely to be affected

15  by such action."  *Id.*  If the biological assessment concludes that listed species are in fact likely to

16  be adversely affected, the agency ordinarily must enter "formal consultation" with the wildlife

17  service.  *See Thomas v. Peterson*, 753 F.2d 754, 763 (9th Cir. 1985).  Formal consultation

18  requires the wildlife service to produce a "biological opinion" that evaluates the nature and extent

19  of the proposed action's effect on the listed species and that, if necessary, posits reasonable and

20  prudent alternatives to the proposed action.  16 U.S.C. § 1536(b)(3)(A).

21      ii.    National Forest Management Act

22      The National Forest Management Act ("NFMA") requires the U.S. Forest Service to

23  create a comprehensive management plan for each national forest, and prohibits any site-specific

24  activities that are inconsistent with the applicable plan.  *See* 16 U.S.C. §§ 1604(a) and (e); *Inland*

25          considerations or protection; and (ii) specific areas outside the
26          geographic area occupied by the species at the time it is listed in
            accordance with the [ESA], upon a determination by the Secretary that
27          such areas are essential for the conservation of the species.

28  16 U.S.C. §1532(5)(A).

1  *Empire Pub. Lands Council v. U.S. Forest Serv.,* 88 F.3d 754, 757 (9th Cir. 1996).  In this case,

2  the project area is almost entirely within the Algoma Late Successional Reserve (hereinafter

3  "LSR"), as designated by the Northwest Forest Plan (hereinafter the "NFP") and Shasta-Trinity

4  National Forest Land and Resource Management Plan (hereinafter the "LRMP").  (AAR 227.)

5  Objectives for the LSR are to protect and enhance conditions of late-successional and old-growth

6  forest ecosystems.  (AAR 227.)

7         iii.    National Environmental Policy Act

8       The National Environmental Policy Act ("NEPA") has twin aims: first, it requires federal

9  agencies "to consider every significant aspect of the environmental impact of a proposed action,"

10  and second, "it ensures that the agency will inform the public that it has indeed considered

11  environmental concerns in its decision making process."  *Kern v. BLM*, 284 F.3d 1062, 1066 (9th

12  Cir. 2002) (quoting *Baltimore Gas & Electric Co. v. Natural Res. Def. Council*, 462 U.S. 87, 97

13  (1983)).  NEPA requires federal agencies to take a "hard look" at the environmental effects of

14  their proposed action, even after the proposal has received initial approval.  *Marsh v. Oregon Nat.*

15  *Res. Council*, 490 U.S. 360, 374 (1989).   The required "hard look" includes considering all

16  foreseeable direct and indirect impacts, requires the agency to undertake a thorough

17  environmental analysis before concluding that no significant impact exists, and involves a

18  discussion of adverse impacts that does not improperly minimize negative side effects.  *See Idaho*

19  *Sporting Congress v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002); *Native Ecosystems Council*

20  *v. U.S. Forest Serv*., 428 F.3d 1233, 1239 (9th Cir. 2005); *Earth Island Inst. v. U.S. Forest Serv.*,

21  442 F.3d 1147, 1159 (9th Cir. 2006).

22       NEPA and its implementing regulations also require federal agencies to prepare an

23  environmental impact statement ("EIS") for "every recommendation or report on proposals for

24  legislation and other major Federal actions significantly affecting the quality of the human

25  environment."  42 U.S.C. § 4332(2)(C); *see* 40 C.F.R. § 1508.11.  The primary purpose of an EIS

26  "is to serve as an action-forcing device to insure that the policies and goals defined in [NEPA] are

27  infused into the ongoing programs and actions of the Federal Government."  40 C.F.R. § 1502.1.

28

**B.     Factual Background**

i.     NSO Critical Habitat and Recovery Planning

The Fish and Wildlife Service listed the Northern Spotted Owl ("NSO") as a threatened species under the ESA in 1990, "because of widespread loss of spotted owl habitat across the spotted owl's range and the inadequacy of existing regulatory mechanisms to conserve the spotted owl." (AR 16089.)  Historically, the NSO has ranged in structurally complex forests, commonly referred to as "old growth" forests, including the Late Successional Reserve that encompasses the Algoma Project.  (*See* ECF No. 33 ¶¶ 55, 73.)  In 1992, the FWS initially designated critical habitat for the NSO.  57 Fed. Reg. 1796 (1992).   In 2008, the FWS revised its critical habitat designation for the NSO, reducing by approximately one-third the amount of land in northern California that it considered critical habitat for the NSO, but continuing the Algoma Project area as Northern Spotted Owl critical habitat.  73 Fed. Reg. 47326 (2008).  In December 2012, the FWS revised its critical habitat designation for the NSO, increasing the amount of protected habitat similar to the 1992 levels.  77 Fed. Reg. 71876 (2012).  On January 3, 2013, the revised critical habitat designation became effective.  (AAR 22916.)  In 2008, the FWS issued an ESA Recovery Plan for the NSO, and in 2011 issued a final revised Recovery Plan (the "2011 Recovery Plan").  73 Fed. Reg. 29471 (2008); 76 Fed. Reg. 38575 (2011).

ii.     The Algoma Vegetation Management Project

The management project at issue in this case, the Algoma Vegetation Management Project (the "Project"), occurs within the Shasta-Trinity National Forest and is subject to the Northwest Forest Plan and the Shasta-Trinity National Forest Land and Resource Management Plan.  (AAR 227.)  The Project is almost entirely contained with the Algoma Late Successional Reserve, and the majority of the project area is within critical habitat for the NSO.[2]  (AAR 227.)  As stated in the Biological Opinion promulgated by the FWS:

> Primary objectives of the Algoma Project are to reduce the likelihood of large-scale disturbance and to protect and enhance conditions of late successional forest ecosystems.  Dense conditions

---

[2] As stated in the April 2013 Biological Assessment, under the revised 2012 critical habitat rule, the Project area includes 11,292 acres of NSO critical habitat.  (AAR 23534.)

of second-growth forest stands within the portions of the 44,377 acre action area are increasing the risk of widespread tree mortality and retarding the development of late-successional forest characteristics.  Additionally, the existing fuel profile places stands at risk to high-severity wildfire, which can result in reduction of high-quality spotted owl habitat.   The Project proposes a combination of thinning, sanitation treatments, and fuels reduction activities on 4,666 acres within the Algoma Late-successional Reserve (LSR) to reduce the risk of habitat loss and to enhance conditions that are resilient to wildfire and other disturbances.

(AAR-22917-18.)  Plaintiff contends in addition that a primary purpose of the Project is to provide for commercial timber harvest.  (ECF No. 52 at 20-21, 30.)  Defendants dispute this characterization.  (ECF No. 69 at 2.)

      iii.    <u>Agency consultation</u>

In May, 2009, the Forest Service submitted a biological assessment (the "2009 BA") to the FWS, requesting formal consultation regarding the proposed Project and its effects on the NSO.  (AR 1-30.)  In July 2009, the FWS issued a biological opinion (the "2009 BiOp"), determining that the Project was not likely to jeopardize the continued existence or adversely modify designated critical habitat for the NSO.  (AR 31.)  In November 2011, the Forest Service disclosed information about recent surveys detecting an NSO in the Project area.  (AR 1162.)  As a result, in March 2012, the Forest Service issued a second biological assessment (the "2012 BA").  (AAR 3598.)  In January 2013, the 2012 revised critical habitat for the NSO became effective.  (AAR 22916.)  The Forest Service then issued an additional biological assessment on April 18, 2013 (the "2013 BA"), which determined that the Algoma Project "may affect, and is not likely to adversely affect the [NSO]", but that the Project "may affect, and is likely to adversely affect [NSO] critical habitat."[3]  (AAR 23553.)  On July 29, 2013, the FWS issued a

---

[3] The relevant section of the 2013 Biological Assessment states:

    [T]he Action 'May affect, and is not likely to adversely affect' the [NSO] and … the action 'May affect, and is likely to adversely affect' [NSO] designated critical habitat … This examination has confirmed the original analysis, but also acknowledges that there will be some short-term and minor adverse effects to elements of critical habitat PCE 3 because treatments in the higher equality foraging habitat within units 32, 38, and 74 may result in: reductions in canopy closure, basal area and habitat layering (vertical and horizontal structure); a reductions in snags (DFMZs), coarse wood, shrubs and forest floor vegetation

new biological opinion (the "2013 BiOp"), determining that the Algoma timber sale "may affect, and is likely to adversely affect 2012 critical habitat."[4]  (AAR 22942.)

### C.   Procedural Background

i.   Procedural History

On November 15, 2012, Plaintiff filed its original Complaint against Defendant Forest Service and Defendant FWS, alleging violations under the ESA, NFMA, and NEPA.  (ECF No. 1.)  On January 8, 2013, Defendant Intervenors Franklin Logging, Inc. and Scott Timber Co., filed an unopposed Motion to Intervene.[5]  (ECF No. 14.)  On September 25, 2013, Plaintiff filed a First Supplemental Complaint (the "Complaint") against Defendant Forest Service and Defendant FWS.[6]  (ECF No. 33.)

Both Defendants and Defendant Intervenors filed Answers to the Complaint.  (*See* ECF No. 39; ECF No. 44.)  On November 22, 2013, Plaintiff filed a Motion for Summary Judgment. (ECF No. 51; corrected on the docket as ECF No. 52.)  On January 13, 2014, both Defendants and Defendant Intervenors, filed respective Motions for Summary Judgment.  (ECF No. 68; ECF

---

from fuels treatments.  The treatment modifications described above further ameliorate these adverse effects, and, as discussed above, foraging habitat function will be retained in these units in the short and long term.

[4] The relevant section of the 2013 Biological Opinion states:

Because portions of units 32, 38, and 74 are considered high quality foraging habitat, the reduction of habitat elements such as canopy closure, basal area, habitat layering, snags, coarse woody debris, shrubs, and forest floor vegetation by proposed treatments is likely to result in measurable changes to the equality of PCE 3.  It is therefore the determination of the Service that the Project may affect, and is likely to adversely affect 2012 critical habitat."  (AAR 22942.)

[5] Franklin Logging, Inc. was the purchaser of the South Algoma Stewardship sale, and Scott Timber, Co., was the purchaser of the Algoma East Stewardship and the Algoma West timber sales; these sales are part of the Algoma Project area.  (*See* ECF No. 14.)

[6] The Court uses "Defendants" to denote the Forest Service and the FWS.  The Court uses "Defendant Intervenors" to denote Franklin Logging, Inc. and Scott Timber Co.

7

1  No. 62.)[7]

2      Accordingly, the Court now considers Plaintiff, Defendants, and Defendant Intervenors'

3  Cross Motions for Summary Judgment.[8]  (ECF No. 52; ECF No. 68; ECF No. 62.)  Plaintiff's

4  First Supplemental Complaint (ECF No. 33) upon which the parties move for summary judgment

5  contains six causes of action:

6      1) against both Defendants, for a failure to insure against the destruction or adverse

7         modification of critical habitat, in violation of the ESA, 16 U.S.C. § 1536(a)(2);

8      2) against both Defendants, for a failure to use the best available science, in violation of

9         the ESA, 16 U.S.C. § 1536(a)(2);

10     3) against Defendant Forest Service, for causing "take" of the Northern Spotted Owl, in

11        violation of the ESA, 16 U.S.C. §§ 1538 and 1539;

12     4) against Defendant Forest Service, for a failure to comply with the applicable land

13        management plans, in violation of the NFMA, 16 U.S.C. § 1604 *et seq*. and 36 C.F.R. §

14        219.10;

---

[7] Defendants and Defendant Intervenors have filed Statements of Undisputed Facts, pursuant to Local Rule 260(a). (ECF No. 70; ECF No. 64.)  Plaintiff has not filed a separate Statement of Undisputed Facts; the Court will construe the section labeled "Factual Allegations" in Plaintiff's Motion for Summary Judgment (*see* ECF No. 52) as Plaintiff's Statement of Undisputed Facts.

[8] Plaintiff has attached two exhibits to its Motion for Summary Judgment:  a "Declaration of Denise Boggs" (ECF No. 51-1) and a "Declaration of Monica Bond" (ECF No. 51-2).  They make personal observations of Forest Service management activities in the Project area and determinations regarding detrimental effects of the Project to NSO recovery.  The declaration of Monica Bond also contains photographs purporting to show trees marked for logging within the Project area.  (*See* ECF No. 51-2)  Defendants have moved to strike these exhibits on the grounds that the Court here is to determine whether agency action is supported by the administrative record already in existence, not a new record made initially in the reviewing court.  *See* ECF No. 65; *Camp v. Pitts*, 411 U.S. 138, 142 (1973); *Friends of Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000).  The Court has read these declarations in detail and finds them helpful and informative; however, the factual allegations and/or claims made within are adequately addressed in Plaintiff's Motion for Summary Judgment (ECF No. 52), including those regarding the logging of old growth trees, the beneficial effects of wildfire to NSO habitat, and the cumulative effects of the Project.  Therefore, the Court does not find that they disturb the Court's review here of whether Defendants abused their discretion in planning and implanting the project.  With respect to the attached photographs in Ms. Bond's declaration, the Court agrees with prior rulings in this District that "[e]ven if … the trees in the photographs appear to be large and therefore also appear to be old, this evidence does not call into question the complex and technical analyses and judgments of the Forest Service and the FWS in their assessment of the characteristics of the habitat affected …" *Conservation Cong. v. U.S. Forest Serv.*, 2012 WL 2339765, at *9 (E.D. Cal. June 19, 2012) *aff'd*. 720 F.3d 1048 (9th Cir. 2013). The Court declines to strike the attached exhibits (ECF No. 51-1 and 51-2); however the Court also declines to further address specific claims contained within them, as the extensive administrative record adequately informs the Court regarding agency action in this case.

5) against Defendant Forest Service, for a failure to comply with the 2011 NSO Recovery Plan, in violation of the NFMA, 16 U.S.C. § 1604 *et seq.* and 36 C.F.R. § 219.10; and

6) against Defendant Forest Service, for a failure to take the required "hard look" at the environmental impact of the project, in violation of the NEPA, 42 U.S.C. 4332(c); 40 C.F.R. § 1508.7; 40 C.F.R. § 1508.25.[9]

ii.     Standard of Review on Summary Judgment

Summary judgment is appropriate when the pleadings and the record demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In this case, the Court's review of Plaintiff's ESA, NFMA, and NEPA claims is governed by the Administrative Procedure Act.  *See Nw. Res. Info. Ctr., Inc. v. NMFS*, 56 F.3d 1060, 1066 (9th Cir. 1995); *Gifford Pinchot Task Force* v. *U.S. Fish & Wildlife Service*, 378 F.3d 1059, 1065 (9th Cir. 2004); *Arizona Cattle Growers' Ass'n v. U.S. Fish and Wildlife, Bur. Ld. Management*, 273 F.3d 1229, 1235 (9th Cir. 2001).  A court conducting APA judicial review does not resolve factual questions, but instead determines "whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."  *Sierra Club v. Mainella,* 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (quoting *Occidental Eng'g Co. v. INS,* 753 F.2d 766, 769 (9th Cir. 1985)).  "[I]n a case involving review of a final agency action under the [APA] ... the standard set forth in Rule 56(c) does not apply because of the limited role of a court in reviewing the administrative record."  *Id.* at 89.  In this context, summary judgment becomes the "mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Id.* at 90.  Pursuant to the APA, the reviewing Court "shall … hold unlawful and set aside agency actions, findings, and conclusions found to be … arbitrary, capricious, or an abuse of discretion or otherwise not in accordance with law," or which have been taken "without observance of procedure required by law."  5 U.S.C. § 706(2)(A)-(D).

---

[9] As the individual claims in the Supplemental Complaint (ECF No. 33) indicate, Plaintiff asserts claims only against one or both Defendants (the Forest Service and/or the FWS) and not Defendant Intervenors.  However, because both Defendants and Defendant Intervenors have moved for summary judgment on Plaintiff's claims, to the extent the Court finds in favor of Defendants with respect to each claim, it also finds in favor of Defendant Intervenors.

1

2    **II. Discussion**

3    **Claim 1: Adverse Modification of Critical Habitat (Forest Service and FWS)**

4         Under the ESA, each federal agency must insure that any action authorized by said agency

5    is "not likely to jeopardize the continued existence of any endangered species or threatened

6    species or result in the destruction or adverse modification of habitat of such species."  16 U.S.C.

7    § 1536(a)(2).  Destruction or adverse modification is defined as:

8              [A] direct or indirect alteration that appreciably diminishes the value of critical
               habitat for both the survival and recovery of a listed species. Such alterations
9              include, but are not limited to, alterations adversely modifying any of those
               physical or biological features that were the basis for determining the habitat to
10             be critical.

11   50 C.F.R. § 402.02.  Pursuant to the Ninth Circuit decision in *Gifford,* 378 F.3d at 1069-1072, this

12   definition is invalid to the extent that an agency considers adverse modification to occur only if

13   habitat necessary for *survival* – ignoring habitat necessary for *recovery* – has been appreciably

14   diminished.  However, Plaintiff acknowledges that Defendant FWS has taken into account

15   survival and recovery habitat for the NSO; the habitat modification analysis in the 2013 BiOp is

16   based upon whether "the affected critical habitat would continue to serve its conservation

17   function or purpose of the species" and on "the effects the proposed action is likely to have on the

18   ability of an area to support life-history needs of the [NSO]."  (*See* ECF No. 52 at 25, n. 8; AAR

19   22937.)

20        The environmental baseline includes "the past and present impacts of all Federal, State or

21   private actions and other human activities in the action area" and "the anticipated impacts of all

22   proposed Federal projects in the action area that have already undergone formal or early section 7

23   consultation."  50 C.F.R. § 402.02; *see Nat'l Wildlife Fed'n v. Nat'l. Marine Fisheries Serv.,* 524

24   F.3d 917, 924 (9th Cir. 2008).

25        Plaintiff contends that both Defendants have failed to insure against adverse modification

26   in this case because: 1) the Project's effects will ensure that minimum thresholds for NSO habitat

27   suitability are not met, as measured in terms of treatment to the core and home range of NSO

28

activity centers; 2) Defendants considered only long-term impacts on the NSO, at the expense of short term loss to habitat suitability; 3) adverse modification will result due to loss of dispersal habitat; and 4) the Project fails to safeguard against the removal of old-growth trees, thus diminishing the capability of the critical habitat.

        i.      Thresholds for habitat suitability

The thrust of Plaintiff's argument is based upon a calculus for adverse modification of habitat, as measured in terms of a "core area" and "home range" surrounding an NSO nest or cluster of detections (i.e. NSO activity centers).  (*See* ECF No. 52 at 25-28; AAR 22925-29.)  The "core" is the 0.5 mile area surrounding a nest or cluster of detections; the "home range" is the 1.3 mile area surrounding a nest or cluster of detections.[10]  (AAR 22925.) Portions of the estimated core and home ranges for four known owl activity centers (ST-203, ST-204, ST-225, and ST-226) are located within the Project area.  (AAR 22923.)   Plaintiff therefore directs the Court to changes occurring within the core and home ranges, and argues that these changes equate to an adverse modification of habitat within the meaning of the ESA.

With respect to activity center ST-203, Defendant FWS found that the 500 acre core area contains 496 acres of suitable habitat, of which 118 acres is nesting and roosting habitat, and 378 acres is foraging habitat.  (AAR 22932.) 48 acres of thinning is proposed within the core, and no nesting and roosting habitat is proposed for treatment.  (AAR 22932.)  The home range of ST-203 contains 2,396 acres of suitable habitat; approximately 472 acres of foraging habitat and 217 acres of dispersal habitat are proposed for treatment.  (AAR 22932.)  Defendant FWS ultimately concluded:

> Given that 1) the amounts of habitat within this activity center [ST-203] are well above general habitat thresholds for incidental take …; 2) a large proportion of suitable habitat in the core and home

---

[10] The 2009 BA used a 0.7 mile radius for its analysis of the core area.  (*See* AR 17, 82.)  Subsequent consultation documents, including the 2013 BiOp, use a 0.5 mile radius.  (*See* AAR 22925.)  To the extent that this modification violates the ESA, Plaintiff directs the Court to this issue but does not otherwise pursue this argument.  (ECF No. 52 at 26, n. 10.)  The Court in this case has relied upon the 0.5 mile radius contained in the most recent consultation documents.  The Court also notes that the core analysis, as measured in terms of a 0.5 mile radius, is contained in the 2009 *Regulatory and Scientific Basis for U.S. Fish and Wildlife Service Guidance for Evaluation of Take for Northern Spotted Owls on Private Timberlands in California's Northern Interior Region*.  (*See* AR 15468-544.)

> range will remain unaffected; and 3) important structural and vegetation elements for foraging owls will be retained in the treated area due to modification of the treatment prescriptions; it is not expected that treatments would have an adverse effect to NSO occupying this activity center.

(AAR 22933.)

With respect to activity center ST-204, treatments are not proposed within the core area. (AAR 22933.)  The Project is not expected to affect nesting/roosting or foraging habitat within the home range.  (AAR 22933.)  The Project is expected to affect 25 acres of dispersal treatment. (AAR 22933.)

With respect to ST-225, Defendant FWS concluded that this activity center was not within 1.3 miles of a treatment unit and therefore silvicultural activities would not affect NSOs in the area.  (AAR 22933.)  Several road systems would be closed or decommissioned within the activity center.  (AAR 22933.)  Outside of potential disturbance from machinery during the process, road closure was expected to be beneficial.  (AAR 22933.)

With respect to ST-226, Defendant FWS acknowledges that the home range measurement was uncertain, given that detections of the NSO were made at nighttime; however, it concluded that suitable habitat (nesting/roosting and foraging) within the home range would not be treated. Approximately 1,013 of the 1,646 acres of forest classified as dispersal habitat within the outer home range analysis will receive treatment.  (AAR 22934.)

Contrary to Plaintiff's claims, the Court does not find that the changes in the number of acres surrounding the activity centers violate thresholds for habitat suitability.  Plaintiff directs the Court to the following statements within the 2009 BiOp: 1) maintaining minimum thresholds "provide a functional home range in relation to reproductive success and survival of the pair" (AR 82); 2) some research "has demonstrated that [NSO] abundance and productivity decrease when the proportion of suitable habitat within 0.7 miles of an activity center falls below 500 acres" (AR 91); 3) an "adequate amount and distribution of foraging habitat within the home range is essential to the survival [of the NSO]".  (ECF No. 52 at 37.)

However, as an initial matter, the Court does not find that these cited statements from an outdated (2009) consultation document establish a framework for the Court's analysis here.  As discussed, since the 2009 BiOp was issued, Defendant Forest Service issued the 2012 Biological Assessment and the 2013 Biological Assessment, and Defendant FWS issued its current 2013 BiOp.  The 2009 BiOp was prepared before the 2012 critical habitat rule became effective, which decreased the amount of critical habitat designated for the NSO within the Project area.[11]  (*See* AAR 23534.)    Second, the most recent 2013 BiOp uses a core analysis area of 0.5 miles rather than 0.7 miles.  (AAR 22925.)   Plaintiff notes this discrepancy, but the Court is not otherwise directed to find that this change in measurement for the core area must lead to a conclusion that Defendants were arbitrary and capricious.  (ECF No. 52 at 26, n. 10.)  Finally, the Court does not have before it an authority holding that the specific volume of modification to critical habitat in this case must result in "adverse modification" within the meaning of the ESA.  For the number of acres proposed for treatment in the varying habitat types (nesting, roosting, foraging, dispersal), the Court cites here to the 2013 BiOp.  (*See* AAR 22923-42.)  The Court also has reviewed tables 13 – 16 from the 2012 BA, displaying the effects on nesting/roosting, foraging, and dispersal habitat in the four activity centers (AAR 3635-36), and Attachment 1 to the 2013 BA, which compares the 2008 versus 2012 revised NSO critical habitat within the Project area, and also displays the effects in the four activity centers (AAR 23555-56).  The exact number of acreage modifications that the Project is expected to cause appears to vary among these consultation documents.  However, Plaintiff does not argue that the acreage changes cited in these documents are incorrect.  The Court is not inclined, absent clear guidance from the parties hereto, to make an exact determination regarding the numbers of acreage changes to be implemented here, specific to each habitat type.  The Court's role is to review the administrative record and to ensure that agency action is not the result of arbitrary or capricious conclusions.  *See* 5 U.S.C. § 706(2)(A)-(D).

---

[11] As explained in the 2013 Biological Assessment, though the 2012 critical habitat rule overall increased the amount of critical habitat designated for the NSO, it decreased the amount of critical habitat in the Project area by approximately 3,143 acres.  (AAR 23534.)

13

1   Accordingly, the Court does not find that Defendants acted arbitrarily or capriciously in

2   their consultation and implementation of the Project, on the grounds proffered here by Plaintiff.

3   ii.      Short term impacts on foraging habitat

4   Plaintiff argues additionally that logging will result in impermissible short term impacts to

5   foraging habitat.  (ECF No. 52 at 37.)  As stated in the 2013 BA, there are 7,282 acres of foraging

6   habitat within the Project area, of which 1,090 will be treated.  (AAR 23534, 23544.)  Defendant

7   FWS concludes that logging will likely "result in variable degrees of reduction of canopy closure,

8   basal area, habitat layering (vertical structure), snags … understory trees, coarse wood, shrubs

9   and forest floor vegetation to a degree where its structure will be simplified and its quality will be

10  degraded."  (AAR 22939.)  However, Defendant FWS also concluded that such changes were not

11  sufficient to downgrade the foraging function that the treated areas currently provide.  Instead,

12  Defendant FWS concluded that proposed treatments are "expected to maintain habitat function

13  for foraging, and are expected to benefit NSO over the long term by reducing inter-tree

14  competition and mortality rates of large trees, increasing tree growth rates, favoring retention of

15  sugar pine and Douglas fir, and fostering desirable species such as black oak through release and

16  re-planting."  (AAR 22939.)

17  Plaintiff relies upon *Pacific Coast Federation of Fisherman's Associations v. U.S. Nat'l*

18  *Marine Fisheries Serv.,* 265 F.3d 1028 (9th Cir. 2011) for the proposition that the Defendants

19  must not minimize the importance of short-term (ten year) impacts to endangered species.  *See*

20  *Pacific Coast Federation*, 265 F.3d at 1037 ("We find nothing in the record to authorize [the

21  National Marine Fisheries Service] to assume away significant habitat degradation … In ten years

22  a badly degraded habitat will likely result in the total extinction of the subspecies that formerly

23  returned to a particular creek for spawning.")  However, the *Pacific Coast* decision was made in

24  the context of an anadromous fish whose breeding and migration cycles depend upon the short

25  term availability of a particular water environment.  *Id.*  Plaintiff does not provide this Court with

26  sufficient information about NSO breeding and/or life cycles that would permit the Court to draw

27  an analogy here to *Pacific Coast*.

28

14

Absent further indication that the short term impacts to NSO foraging habitat must override both expected long term benefits and the continued functionality of the current foraging habitat, the Court cannot find that Defendants failed to insure against the adverse modification of habitat on these grounds.

iii. Logging within dispersal habitat

The 2013 BA provides that 2,746 acres of dispersal habitat are within the Project area, of which 1,288 acres will be treated.  (AAR 23534, 23544.)  The 2013 BiOp concludes that: 1) "the small scale of habitat removal will not influence the stand or landscape-level availability of dispersal habitat and the degree of habitat (forest) connectivity within the Algoma project area and surrounding landscape"; and 2) "plantation treatments are likely to be beneficial by opening up overly dense stands and increasing stand species and spatial composition heterogeneity."  (AAR 22930.)

Plaintiff argues that, given uncertainty about the importance of dispersal habitat for the NSO, Defendants should have exercised greater precaution in modifying dispersal habitat.  (ECF No. 52 at 30.)  Plaintiff directs the Court to a principle under the ESA that "require[s] agencies to afford first priority to the declared national policy of saving endangered species." *Tennessee Valley Authority,* 437 U.S. 153, 185 (1978).  However, the Court is not advised of a specific cautionary principle regarding dispersal habitat that Defendants did not uphold in this case.  The consultation documents in this case show that Defendants considered the Project area to be a high risk of large-scale habitat loss due to insects, disease, and fire, as caused by unnaturally dense stands, and a key purpose of the Project was to reduce that risk.  (AAR 227-28; AAR 22917-18.)

Plaintiff also argues that logging within dispersal habitat will adversely modify habitat connectivity.  Plaintiff raises a concern about critical habitat unit 8, subunit ECS-3, which provides habitat connectivity between units that are otherwise geographically isolated.  (*See* ECF No. 52 at 40.)  The 2013 BiOp, which specifically identifies unit 8, subunit ECS-3, as an essential unit for habitat connectivity, notes that "special management considerations or protection are required in this unit," and concludes that "maintaining connectivity and recruiting additional

15

high-quality habitat for the NSO is especially important….”  (AAR 22936.)  That Defendant

FWS undertook to specifically highlight the importance of this unit, however, does not compel

this Court to find that Defendant FWS failed to insure against adverse habitat modification.

Plaintiff also argues that Defendants should have used the “appreciably diminish”

standard in evaluating the Project’s effects on dispersal habitat, as provided for in 50 C.F.R. §

402.02, as opposed to a “significantly affect” standard.  (*See* ECF No. 52 at 30-32; ECF No. 69 at

14).  At times in the 2013 BiOp, Defendant FWS concludes that Project effects would not

“significantly affect” the NSO’s use of dispersal habitat.  (*See* AAR 22933, 22934, 23941.)[12]

However, the Court’s review of the sections indicated by Plaintiff finds that they do not refer

specifically to the modification of critical habitat, but rather to the effect on NSO activity within

that habitat.  Plaintiff’s inapposite references to the words “significantly affect”, as they appear at

times in the consultation documents, does not establish that Defendants applied the wrong

standard in evaluating adverse modification of critical habitat.

      iv.      Diameter limit / old growth trees

Plaintiff contends that the Project fails to safeguard against the removal of old-growth

trees, thus diminishing the capability of the critical habitat.  Specifically, Plaintiff contends that

Defendants violated the ESA because they do not use a diameter limit when logging.  Plaintiff

points to an acknowledgement in the 2013 BiOp of a study finding that the “[Presence] of trees

greater than 20-24 inches dbh is considered an important attribute of foraging habitat.”  (AAR

22927.)  Plaintiff also points to the 2011 NSO Recovery Plan, which articulates the need for

---

[12] For example, the FWS states in the 2013 BiOp:

> Plantation treatments are not expected to *significantly change* the potential for use as dispersal habitat in the short term, and are considered beneficial in the long term. (AAR 22933, emph. added) …  The treatments are not expected to *significantly affect* the use of these stands or the ability to provide for dispersal to and from this activity center [ST-226] (AAR 22934, emph. added) … Road reconstruction and decommissioning do not involve removal of NSO habitat elements, and construction of temporary roads (1.17 miles in foraging and dispersal habitat) will result in removal of a small number of trees and is not expected to *significantly affect* the function of PCE3 or PCE4 … (AAR 22941, emph. added).

16

large-diameter trees in NSO habitat.  (*See* ECF No. 52 at 37.)  However, as discussed in the EIS, Defendant Forest Service declined to adopt a treatment plan that prevented the logging of trees over 20 inches in diameter, because to do so would leave many tree stands overstocked, rendering them, among other effects, more susceptible to beetle infestation.  (AAR 267.)  The EIS advises managers of late-successional forest systems to move away from approaches based on diameter limits and instead focus on old growth trees.  (AAR 267.)  The 2013 BA (to cite one consultation document) provides that a main purpose of the Project is to accelerate the development of late-successional and old-growth habitat characteristics, and that treatments are designed to afford the NSO an older and more structurally complex habitat.  (*See* AAR 23539.)  The Court is not aware of statutory or case law authority – and Plaintiff does not direct the Court to such authority – holding that the selection of which trees to log in this case must be based on a predetermined diameter limit.

   For the aforementioned reasons, with respect to Claim 1, the Court does not find that Defendants were arbitrary or capricious in insuring against the adverse modification of critical habitat.  Therefore summary judgment is granted in favor of Defendants and Defendant Intervenors.


**Claim 2: Failure to Use Best Available Science (Forest Service and FWS)**

   Under the ESA, Defendants must, in consulting over the nature and extent of jeopardy posed to the NSO, use "the best scientific and commercial data available."  16 U.S.C. § 1536(a)(2).  Plaintiff contends that Defendants failed to use the best available science, with respect to 1) the use of diameter limits when logging and 2) the beneficial effects of wildfire on the NSO.  (ECF No. 52 at 33-37.)

   As discussed, *supra*, the Court finds that Defendant considered and rejected a treatment plan that selected trees to log based on a 20 inch diameter limit.  The EIS advises managers of late-successional forests to move away from approaches based on diameter limits, and instead focus on the retention of old-growth trees.  (*See* AAR 267.)  Plaintiff does not otherwise show

that the best available science mandates the use of a diameter limit when logging.

With respect to the beneficial effects of wildfire, Plaintiff asserts that selected studies were ignored that demonstrate a correlation between NSO recovery and the use of high-severity burned areas for foraging.  (*See* ECF No. 52 at 44.)  These studies were referenced in the 2013 BiOp, which determined that they were inconclusive as to the current Project, due to their sample size and fire effects peculiar to each area studied.[13]  (AAR 22928.)  Plaintiff makes a valid point in that the 2013 BiOp does not contain an extensive discussion of the particular studies referenced by Plaintiff.  However, the 2013 BiOp contains a discussion of relevant scientific literature discussing the effects of wildfire on the NSO, acknowledges some beneficial effects of wildfire, and concludes that fires are a "change agent" with respect to the NSO, for which more research is desirable.[14]  (*See* AAR 22972-73.)  Defendant Forest Service concluded that "[w]hile spotted owls can make use of some post-fire landscapes, fire also reduces the function of some habitat and likely removes some from immediate usability, particularly in areas of high-severity fire." (AAR 208.)   Defendant Forest Service further concluded that:

> The amount of habitat mortality expected if a wildfire were to occur under current vegetative conditions is of concern. Implementing the selected alternative will reduce the risk of high intensity wildfire and/or wide-scale insect or disease epidemics in forest stands and help to reduce effects to high quality NSO habitat. Reducing the surface and ladder fuels will reduce the likelihood of habitat loss from wildfire whether the threat originates from within or outside of the LSR boundary [], consistent with the LSRA and with recovery actions in the 2011 NSO Recovery Plan.

---

[13] As stated in the 2013 BiOp:

> Vegetation treatments proposed in the Algoma Project are intended to benefit [Northern Spotted Owls] by reducing the potential for habitat loss to high-severity wildfire.  Scientific opinion regarding the risk posed by wildfire (Hanson et al. 2010, Spies et al. 2010) and the comparative risks of fuels reduction treatments varies widely (USFWS 2011).  While recent research indicates that spotted owl continue to occupy and may reproduce in some burned areas (Bond et al. 2002, 2009; Lee et al. 2012; Clark et al. 2011, 2013), these findings are strongly influenced by small sample sizes and the extent and spatial pattern of fire effects particular to each area studied.  (AAR 22928.)

[14] *See* the 2011 Recovery Plan (AR 16149-151) for an extensive discussion of the effects of wildfire on NSO habitat. The Recovery Plan concludes that "fires are a change agent for spotted owl habitat, but there are still many unknowns regarding how much fire benefits or adversely affects spotted owl habitat."  (AR 16151.)

(AAR 208.)

As the Court noted in *League of Wilderness Defenders Blue Mountains Biodiversity Project v. Allen*, 615 F.3d 1122, 1131 (9th Cir. 2010), the "highest deference is owed to the Forest Service's technical analysis and judgments within its area of expertise." "The court's role in reviewing agency actions is not to weigh conflicting expert opinions or to consider whether the agency employed the best methods, but instead, when an agency's particular technical expertise is involved, to guard the agency's discretion." *Conservation Congress v. U.S. Forest Serv.*, 2012 WL 2339765 at *7 (E.D. Cal. 2012) (referencing *Forest Guardians v. U.S. Forest Serv.,* 329 F.3d 1089, 1097, 1099 (9th Cir. 2003); *Friends of Endangered Species, Inc. v. Jantzen,* 760 F.2d 976, 986 (9th Cir. 1985); *Marsh v. Or. Natural Res. Council,* 490 U.S. 360, 376-77 (1980).)  In addition, an agency's use of the best available science and commercial data "does not explicitly limit the Secretary's analysis to apolitical considerations ... [T]he Secretary must be permitted to choose the one that best suits all of its interests, including political or business interests." *SW Center for Biological Diversity v. U.S. Bureau of Reclamation,* 143 F.3d 515, 523 n. 5 (9th Cir. 1998).

Given the complex and technical task of fire risk management, and given the ample consideration by Defendants of the effects of wildfire within the Project area, the Court defers to the judgment of the federal agencies in this case.  Summary judgment is therefore granted in favor of Defendants and Defendant Intervenors with respect to Claim 2.


**Claim 3: Prohibited "Take" of the NSO (Forest Service)**

Plaintiff's First Supplemental Complaint contends that habitat modification in the Project area constitutes "harm" and "harassment" within the ESA's "take" definition.  (*See* ECF No. 33 at 19.)  Section 9(a)(B) of the ESA prohibits the take of listed species within the United States, except as provided for in section 10, which allows for incidental take if certain safeguards are met.  *See* 16 U.S.C. §§ 1538, 1539.  The ESA defines "take" as "…to harass, harm, pursue, hunt,

shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct."  16 U.S.C. § 1532.19.  As advised by Plaintiff, the regulatory definition of "harm" includes "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering."  50 C.F.R. § 17.3.

Plaintiff does not further pursue this claim, in either its Memorandum In Support of Motion for Summary Judgment (ECF No. 52) or its Reply in Support of Motion for Summary Judgment (ECF No. 74). In its argument regarding Claim 1, Plaintiff points to a description of the home range of activity center ST-203 in the EIS, which states: "The amount of foraging habitat is currently well above the 1,085 [acres] incidental take threshold values."  (*See* AAR 640.) Plaintiff asks the Court to infer from this statement that take must be presumed if foraging habitat within any home range drops below 1,085 acres; Plaintiff further argues that ST-204 does not meet this requirement.  (ECF No. 52 at 28.)  The home range of ST-204 contains 718 acres of nesting, roosting, and foraging habitat, and 76 acres of dispersal habitat; 25 acres of dispersal habitat are proposed for treatment but it is not expected to impact habitat functionality.  (AAR 637.)  Given this minimal proposed treatment, the Court cannot find that the Project's implementation will be the cause of "take" within the meaning of the ESA.

The Court will infer that Plaintiff's arguments concerning the adverse modification of habitat in Claim 1 are to apply equally to its arguments concerning "take" in Claim 3.  The Court finds for Defendants with respect to Claim 1, and this determination encompasses a finding that "take" has not occurred as a result of this modification.

Therefore summary judgment is granted in favor of Defendants and Defendant Intervenors with respect to Claim 3.

**Claim 4: Compliance with Land Management Plans under the NFMA (Forest Service)**

The NFMA provides that Defendant Forest Service's activities carried out on the National Forests "shall be consistent with land management plans."  16 U.S.C. § 1604(I); 36 C.F.R.

20

219.10(e).  The relevant land management plan in this case is the Shasta-Trinity National Forest Land and Resource Management Plan ("LRMP").  Plaintiff contends that the Forest Service failed to comply with 1) LRMP provisions regarding snags and down logs, and 2) an NFMA mandate to maintain viable populations of the sensitive species the Northern goshawk (*Accipiter gentilis*), the Pacific fisher (*Martes pennanti*), and the American marten (*Martes americana*).  (*See* ECF No. 52 at 38-40).

       i.      <u>Snags and down logs</u>

The LMRP directs Defendant Forest Service to "maintain dead/down material, hardwoods, and snags at naturally occurring levels."  (AAR 7811.)  The LSR Assessment provides further guidance as to the desired number of snags and down logs, including that the average number of snags, which are at least 20 inches in diameter, should equal 2 to 6 snags per acre within mixed Conifer habitat.  (AAR 7507-08.)

Plaintiff references treatment within the Defensible Fuel Management Zone, which "will result in a small proportion of specific thinning that will be deficit in snags," but that nonetheless does not prevent snag retention guidelines from being met "at the scale of 100-acre landscape." (AAR 2101.)  Plaintiff argues, pursuant to *Oregon Natural Resources Council v. Brong*, 492 F.3d 1120, 1130 (9th Cir. 2007), that such treatment is an impermissible attempt to "dilute the effects of its proposed activities by averaging the snag retention over [] a wide area."  (ECF No. 52 at 38.)

However, the snag retention at issue in *Brong* specifically was as follows: of the 1,004 acres to be included as harvest areas, 679 acres were to receive harvest of all snags, and the remaining 325 acres were to retain all snags, thus technically accounting for a required 8-12 snags per acre, but in effect meaning that over two-thirds of the affected acreage would be completely stripped of all snags.  *See Brong*, 492 F.3d at 1129-30.  There is no indication that the snag removal in this case is analogous to the treatment in *Brong*.   The Design Criteria and Resource Protection Measures of the EIS indicates the Project will "retain [where snags or down logs of this size exist and except for instances where snags must be felled for safety] an average of 2 to 6

snags per acre … meeting the minimum requirements of 20 inches DBH and at least ten feet in height."  (AAR 536.)  Moreover, the treatment referenced by Plaintiff is to occur in the Defensible Fuel Management Zone, a 150-foot corridor established around important Forest System operation and public use roads; the removal of snags in this area is done as a safety precaution for public and fire personnel.  (AAR 229, 257.)

With respect to the Project's effects on snags and down logs, the Court does not find that Defendant Forest Service acted arbitrarily or capriciously in failing to comply with the NFMA.

ii.     Sensitive Species

Pursuant to 16 U.S.C. 1604(g)(3)(B), Defendant Forest Service is required to "provide for diversity of plant and animal communities."  To meet this requirement, Defendant Forest Service must ensure that viable populations of native animals are maintained, a duty that "applies with special force to 'sensitive' species." *Ecology Center v. Austin*, 430 F.3d 1057 (9th Cir. 2005) (citing *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 556 n. 2 (9th Cir. 2000).  The Northern goshawk, Pacific Fisher, and American marten are listed as sensitive species in the Project area.  (ECF No. 52 at 40.)  Plaintiff briefly argues that Defendant Forest Service lacks substantive information about the populations of these species, and therefore contends that Defendant Forest Service cannot ensure that viable populations will be maintained.  (ECF No. 52 at 40; ECF No. 74 at 7-8.)  However, Plaintiff does not otherwise advise the Court as to specific management or population monitoring duties with which Defendant Forest Service failed to comply.

A prior ruling in this District, *Conservation Congress v. U.S. Forest Service*, No. 08-2483, at *5-8 (E.D. Cal. June 4, 2009), *aff'd* No. 09-16182, 371 Fed. Appx. 723 (9th Cir. 2010) found that the use of habitat capability models, as applied to the goshawk and furbearer species under the Shasta-Trinity LRMP, is a permissible form of population documentation.  As that Court noted, the Ninth Circuit has "repeatedly approved the Forest Service's use of the amount of suitable habitat for a particular species as a proxy for the viability of that species, and its use of habitat as a proxy to measure a species' population." *See id*.; *Ecology Ctr. v. Castaneda*, 574

F.3d 652, 664 (9th Cir. 2009).  "When the Forest Service decides, in its expertise, that habitat is a reliable proxy for species' viability in a particular case, the Forest Service nevertheless must both describe the quantity and quality of habitat that is necessary to sustain the viability of the species in question and explain its methodology for measuring this habitat." *Lands Council v. McNair*, 537 F.3d 981, 997-98 (9th Cir. 2008).

With respect to the goshawk, the EIS states that Defendant Forest Service evaluated population by using a "habitat capability model, research data, vegetation classes in the northern section of the Algoma LSR, stand exam data, and field review." (AAR 546.)  The EIS determined that past projects impacted 158 acres, or 1.4% of suitable habitat within the cumulative impacts analysis area, and that it occurred outside of nest cores. (AAR 313.)  The EIS contains an extensive discussion of the Project's anticipated effects to the goshawk, including that Project activities will not occur within the 200-acre core areas of the four goshawk territories in the Project area. (AAR 311.)  The EIS predicts that all treated stands are expected to continue to function as foraging habitat after the Project is implemented, and overall concludes that the Project will not hinder goshawk viability.  (*See* AAR 310-313.)  Plaintiff references the EIS for the fact that the Project will impact 27% of suitable habitat and reduce canopy cover from 70% to 45% in the short term, with canopy cover expected to return in 20-30 years.  (AAR 554-555.)  However, absent further guidance from the parties as to the precise relevance of this effect, this Court is not prepared to find that Defendant Forest Service was arbitrary or capricious in its assessment of effects on the goshawk.

Defendant Forest Service evaluated Project effects on the American marten and Pacific fisher together because they share similar habitat requirements.  (AAR 561.)  Based on habitat capability modeling for these species, Defendant Forest Service concluded that there was "little to no" high quality habitat for either species in the Project area.  (AAR 563.)  Under a different analysis (modeled after NSO habitat), Defendant Forest Service determined that 96% of the high-quality habitat in the Project area would remain unaffected and available for use by these

species.[15]  (AAR 569.)  Also under the NSO-habitat analysis, Defendant Forest Service concluded

that 42 acres of potential denning/resting habitat and 1,268 acres of foraging habitat would be

degraded (AAR 564); 20 acres of foraging habitat would be removed due to road-related actions

(AAR 565); and the proposed action was expected to provide higher quality den and nest side

structure over the long term, because of larger diameter trees and larger size classes of down

wood (AAR 569).  Plaintiff asserts that Defendant Forest Service did not conduct surveys of the

marten or fisher in the Project area; the EIS indicates that furbearer surveys were conducted in the

McCloud Flats and Sacramento River Canyon area north and west of the project area.  (*See* ECF

No. 52 at 40; AAR 565.)  Plaintiff does not otherwise address the relevance of these surveys.

Defendant found the Project would not cause a trend toward federal listing for American marten,

increase the current priority listing for Pacific Fisher, or result in a loss of viability for either

species.  (AAR 569; *see* AAR 561-70.)

Plaintiff does not specify any management or population monitoring duties under the

NFMA or Shasta-Trinity LRMP with which Defendant Forest Service failed to comply.  Without

more, the Court cannot find that Defendant Forest Service's activities with respect to these

species constitutes arbitrary and capricious conduct.  The Court therefore grants summary

judgment in favor of Defendants and Defendant Intervenors with respect to Claim 4.


**Claim 5: Compliance with the 2011 NSO Recovery Plan under the NFMA  (Forest Service)**

The Complaint contends broadly that the Forest Plan requires the Forest Service to

manage threatened species under existing recovery goals, as identified in the species Recovery

Plan.  (ECF No. 33 at 21.)  Plaintiff does not otherwise brief the Court as to the specific provision

under the NFMA that has been violated.  Plaintiff's Memorandum in Support of Summary

Judgment (ECF No. 52) makes a claim under the Endangered Species Act, as the Court has

discussed, to the effect that the Project does not adhere to the 2011 Recovery Plan's

recommendation that large diameter and/or old growth trees be retained in NSO habitat.  (ECF

---

[15] The Forest Service considered NSO nesting/roosting and foraging habitat as a proxy for fisher and marten habitat because it contains structural components favored by fisher and marten.  (AAR 564.)

1    No. 52 at 37.)  However, Plaintiff does not otherwise address this claim in its briefing.  Therefore

2    summary judgment is granted to Defendants and Defendant Intervenors with respect to Claim 5.

3    **Claim 6: Failure to Address Opposing Scientific Views and to Address Cumulative Impacts,**

4    **in violation of NEPA (Forest Service)**

5          Plaintiff contends that Defendant Forest Service violated the NEPA because: 1) it failed to

6    disclose opposing scientific views about the relationship between the NSO and wildfire; and 2) it

7    failed to adequately address cumulative effects of the Project to the NSO.

8          i.        Scientific studies regarding wildfire

9          As a component of the requirement that Defendant Forest Service provide a full and fair

10   discussion of environmental impacts of a proposed action (i.e. the requisite "hard look"), the

11   Ninth Circuit has faulted an agency for not addressing uncertainties relating to the action "in any

12   meaningful way."  *See Seattle Audobon Soc'y v. Espy*, 998 F.2d 699, 704 (9th Cir. 1993).  NEPA

13   does not require that Defendant Forest Service affirmatively present every uncertainty in its EIS,

14   but it "must acknowledge and respond to comments by outside parties that raise significant

15   scientific uncertainties and reasonably support that such uncertainties exists."  *See Lands Council*,

16   537 F.3d at 1001.  That said, an agency must be permitted discretion in relying on the reasonable

17   opinion of its own qualified experts, even if the court might find contrary views more persuasive.

18   *See Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21 (1976).  A reviewing court is not to entertain a

19   "battle of the experts" when plaintiffs proffer expert testimony to set against the agency's

20   professional judgment.  *See Lands Council*, 537 F.3d at 1000.

21         As the Court has discussed, Plaintiff points to studies showing the benefits of wildfire to

22   NSO habitat, and contends that the Forest Service did not adequately address and disclose these

23   studies.  (ECF No. 52 at 49.)  However, the EIS in this case contains an extensive discussion of

24   fire management treatment plans.[16]  (AAR 293-95.)  A stated aim of the Algoma Project is to

25   reduce the risk of large-scale habitat loss due to environmental stressors such as wildfire, and

26   therefore fire management strategies are a focal part of all proposed treatment plans.  (AAR 227-

27   _____

28   [16] The studies referenced by Plaintiff are included in the 2013 BiOp.  (AAR 22927-28.)

28.)  The "Public Comments" section of the EIS acknowledges that wildfire can benefit aspects of NSO habitat, but re-affirms its conclusion that existing fuel conditions in the Project pose the threat of large-scale wildfire, which in turn could result in the loss of NSO habitat.  (AAR 855-56.)

The Court's role in this regard is "simply to ensure that the Forest Service made no clear error of judgment that would render its action arbitrary and capricious."  *See Lands Council*, 537 F.3d at 993 (internal quotations omitted).   The Court does not find that Defendant made this error.

    ii.    Cumulative impacts

A cumulative impact is defined in NEPA's implementing regulations as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions … Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time."  40 C.F.R. § 1508.7.  "A proper consideration of the cumulative impacts of a project requires some quantified or detailed information; general statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided."  *Klamath-Siskyiuou Wildlands Ctr. v. BLM,* 387 F.3d 989, 993 (2004) (internal quotations omitted).  "[I]n assessing cumulative effects, the Environmental Impact Statement must give a sufficiently detailed catalogue of past, present, and future projects, and provide adequate analysis about how these projects, and difference between the projects, are thought to have impacted the environment."  *Lands Council v. Powell,* 395 F.3d 1019, 1028 (2004); *see also Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 971-72 (9th Cir. 2006).

The cumulative effects report within the EIS considered the impacts of the Algoma Project with respect to two spatial scales: the "Action Area", which consists of a 1.3 mile buffer around the Algoma Project Area, and a broader scale, totaling approximately 89,028 acres of mostly federal land.[17]  (*See* AAR 896, 902, 906.)

---

[17] *See* Table 51 for a list of the projects and acreages affected within the Action area over the past 20 years.  (AAR 897-98.)  *See* Table 52 for a list of the projects and acreages affected within the larger landscape over the last ten

1    Notably, the Action Area analysis determined the following:  1) 32 projects were

2    completed within the Project area within the prior 20 years, resulting in approximately 9,000

3    acres of commercial thinning, 260 acres of patch or clear cutting, and about 113 acres of

4    sanitation/salvage; 2) future Federal projects to overlap the Project area include the Moosehead,

5    East McCloud, and Toad Mountain Projects; 3) approximately 17,960 acres of timber harvest

6    plans have occurred on private lands within the Project area in the last 20 years.  (*See* AAR 897-

7    98.)

8    With respect to habitat modification, the EIS summarizes the cumulative effects on the

9    Project area to include the following: 1) the degradation of 7,424 acres of foraging habitat over

10   the last 20 years; the Forest Service determined that this habitat remained functional as foraging

11   habitat post-treatment; 2) the Algoma Project would degrade approximately 1,815 acres with

12   thinning treatments; the degraded habitat is expected to remain fully functional as foraging habitat

13   post-treatment;[18] 3) future Federal actions that are expected to affect suitable NSO habitat are

14   limited to the Moosehead project which would degrade approximately 80 acres of foraging

15   habitat; degraded habitat is expected to remain fully functional as foraging habitat post-treatment;

16   4) where quantifiable, private actions have decreased nesting habitat by 80 acres and foraging

17   habitat by 607 acres.  (*See* AAR 900.)

18   Plaintiff contends that in NSO activity center ST-204, private land comprises the majority

19   of the home range and that the EIS provides no actual analysis of the impacts related private lands

20   logging in ST-204.  (ECF No. 52 at 42.)  Defendant responds that the Algoma Project does not

21   propose treatment within ST-204, and thus it need not address the cumulative impact of the

22   Project with respect to private logging.[19]  (ECF No. 69 at 33.)  The Court finds that the

23   years.  (AAR 903.)

24   [18] The EIS describes its use of the term 'degrade' as: "To be distinguished from downgrade, indicates a reduction in
25   habitat quality, but not habitat function following the effect (i.e., an area that functioned as foraging habitat prior to
     the effect, still provides such function after the effect, but perhaps is more limited due to a temporary reduction in
26   prey base)."  (AR 895.)

27   [19] As discussed, the EIS provides that there are no proposed treatments of nesting/roosting or foraging habitat within
     the core or home range of ST-204; 25 acres of dispersal habitat are proposed for treatment, but this treatment is not
     expected to remove habitat functionality.  (AAR 637.)

28

cumulative effects report contains a discussion of the timber harvest plans (THPs) occurring on private lands in the last 20 years, including a review of changes in nesting and roosting habitat, measures taken by THPs to minimize effects to the NSO, and the extent of suitable and non-suitable NSO habitat.  (*See* AAR 898-900.)[20]

Plaintiff also contends that the cumulative effects report does not adequately consider the cumulative effects of the Moosehead Project.  (ECF No. 69 at 52.)  However, the report discloses that portions of two Moosehead Project units (units 124 and 127) overlap the Project Area and estimates that thinning in these units would degrade 80 acres of foraging habitat.  (AAR 898.)  Within the second, larger-scale analysis, the report states that the Moosehead Project would degrade 1,400 acres of foraging habitat, and concludes that this habitat would return within roughly 10 years.  (AAR 905.)

The cumulative effects report in the EIS provides a sufficiently detailed catalogue of past, present, and future projects, including quantified predictions regarding changes to nesting, roosting, and foraging habitat for the NSO.  The Court does not otherwise find that Defendant Forest Service acted arbitrarily or capriciously in failing to consider the cumulative effects to the NSO.

Therefore, summary judgment with respect to Claim 6 is granted in favor of Defendants and Defendant Intervenors.


**III.    Conclusion**

For the reasons discussed herein, Plaintiff's Motion for Summary Judgment (ECF No. 52) on Claims 1 through 6 of the First Supplemental Complaint (ECF No. 33) is DENIED.  Defendants' Motion for Summary Judgment (ECF No. 68) and Defendant Intervenors' Motion for Summary Judgment (ECF No. 62) is GRANTED.  Plaintiff's Motion for Preliminary Injunction (ECF No. 81) is moot and the Court does not reach this issue.

---

[20] The EIS discloses that the acreages and calculations used in this part of the report are based on the CALFIRE database.

Dated: May 16, 2014

_____
Troy L. Nunley
United States District Judge